# UNITED STATES *v.* VILLAMONTE-MARQUEZ ET AL.

No. 81–1350.   Argued February 23, 1983—Decided June 17, 1983

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, and in Part I of which STEVENS, J., joined, *post*, p. 593.

*Samuel A. Alito, Jr.,* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Jensen, Deputy Solicitor General Frey, Louis M. Fischer,* and *Stuart P. Seidel.*

*Richard P. Ieyoub* argued the cause and filed a brief for respondents.

JUSTICE REHNQUIST delivered the opinion of the Court.

Congress has provided that "[a]ny officer of the customs may at any time go on board of any vessel . . . at any place in the United States . . . and examine the manifest and other documents and papers . . . and to this end may hail and stop such vessel . . . and use all necessary force to compel compliance." 46 Stat. 747, as amended, 19 U. S. C. § 1581(a).[1] We are asked to decide whether the Fourth Amendment is offended when customs officials, acting pursuant to this

---

[1] See also 46 U. S. C. § 277 (provides similar authority for "[a]ny officer concerned in the collection of the revenue"). Cf. 14 U. S. C. § 89(a); 19 U. S. C. § 1581(b).

statute and without any suspicion of wrongdoing, board for inspection of documents a vessel that is located in waters providing ready access to the open sea.[2]

[2] Section 1581(a) provides customs officials with authority beyond boarding for document inspections. In this case, however, we are concerned only with the more narrow issue.

Respondents briefly argue that we should not reach even this question. Relying on *United States* v. *Sarmiento-Rozo*, 592 F. 2d 1318 (CA5 1979), respondents contend that this case is moot because they have been deported and, subsequent to the issuance of the mandate by the Court of Appeals reversing their convictions, the indictments against them were dismissed. *Sarmiento-Rozo* provides some authority for respondents' argument; nevertheless, we reject the contention.

The Government has sought review of the Court of Appeals' decision reversing respondents' convictions. Ordinarily our reversal of that decision would reinstate the judgment of conviction and the sentence entered by the District Court. See *United States* v. *Morrison*, 429 U. S. 1, 3 (1976) *(per curiam)*. The fact that the Government did not obtain a stay, thus permitting issuance of the mandate of the Court of Appeals, would not change the effect of our reversal. See *Aetna Casualty & Surety Co.* v. *Flowers*, 330 U. S. 464, 467 (1947); *Carr* v. *Zaja*, 283 U. S. 52 (1931). Under our reasoning in *Mancusi* v. *Stubbs*, 408 U. S. 204, 205–207 (1972), the absence of an indictment does not require a contrary conclusion. Further, it is settled law that the preliminary steps in a criminal proceeding are "merged" into a sentence once the defendant is convicted and sentenced. See *Parr* v. *United States*, 351 U. S. 513, 518–519 (1956); *Berman* v. *United States*, 302 U. S. 211 (1937). Upon respondents' conviction and sentence, the indictment that was returned against them was merged into their convictions and sentences, thus making unnecessary a separate reinstatement of the original indictment.

That respondents have been deported likewise does not remove the controversy involved. Following a reversal of the Court of Appeals, there would be a possibility that respondents could be extradited and imprisoned for their crimes, or if respondents manage to re-enter this country on their own they would be subject to arrest and imprisonment for these convictions. See *United States* v. *Campos-Serrano*, 404 U. S. 293, 294, n. 2 (1971). In addition, as a collateral consequence of the convictions, the Government could bar any attempt by respondents to voluntarily re-enter this country. 8 U. S. C. § 1182(a)(9). See *Pennsylvania* v. *Mimms*, 434 U. S. 106, 108, n. 3 (1977) *(per curiam); Sibron* v. *New York*, 392 U. S. 40, 53–57 (1968).

Near midday on March 6, 1980, customs officers, accompanied by Louisiana state policemen, were patrolling the Calcasieu River Ship Channel, some 18 miles inland from the gulf coast, when they sighted the *Henry Morgan II*, a 40-foot sailboat, anchored facing east on the west side of the channel. The Calcasieu River Ship Channel is a north-south waterway connecting the Gulf of Mexico with Lake Charles, Louisiana. Lake Charles, located in the southwestern corner of Louisiana, is a designated Customs Port of Entry in the Houston, Texas Region. While there is access to the channel from Louisiana's Calcasieu Lake, the channel is a separate thoroughfare to the west of the lake which all vessels moving between Lake Charles and the open sea of the Gulf must traverse.

Shortly after sighting the sailboat, the officers also observed a large freighter moving north in the channel. The freighter was creating a huge wake and as it passed the *Henry Morgan II* the wake caused the smaller vessel to rock violently from side to side. The patrol boat then approached the sailboat from the port side and passed behind its stern.

---

The dissent's discussion of mootness places heavy reliance on this Court's decision in *Ex parte Bain*, 121 U. S. 1 (1887), and a hypothetical example in a civil proceeding between Peter and David. *Post*, at 594–598, and n. 1. *Ex parte Bain* was long ago limited to its facts by *Salinger* v. *United States*, 272 U. S. 542 (1926), where the Court said:

"In the case of *Ex parte Bain*, 121 U. S. 1, on which the accused relies, there was an actual amendment or alteration of the indictment to avoid an adverse ruling on demurrer, and the trial was on the amended charge without a resubmission to a grand jury. *The principle on which the decision proceeded is not broader than the situation to which it was applied.*" *Id.*, at 549 (emphasis added).

In the present case, there is no doubt whatever that a valid indictment was returned by the grand jury, the case was tried on that indictment, and, unlike the dissent's hypothetical civil analogy, a judgment pursuant to Federal Rule of Criminal Procedure 32 was entered on the jury verdict of guilty. At this juncture, for reasons explained above, the indictment was merged into the judgment, and a successful effort on the part of the Government to reverse the judgment of the Court of Appeals would have the effect of reinstating the judgment of conviction.

On the stern the name of the vessel, the *"Henry Morgan II,"* was displayed along with its home port, "Basilea." The officers sighted one man, respondent Hamparian, on deck. Officer Wilkins twice asked if the sailboat and crew were all right. Hamparian shrugged his shoulders in an unresponsive manner.

Officer Wilkins, accompanied by Officer Dougherty of the Louisiana State Police, then boarded the *Henry Morgan II* and asked to see the vessel's documentation. Hamparian handed Officer Wilkins what appeared to be a request to change the registration of a ship from Swiss registry to French registry, written in French and dated February 6, 1980. It subsequently was discovered that the home port designation of "Basilea" was Latin for Basel, Switzerland; the vessel was, however, of French registry.

While examining the document, Officer Wilkins smelled what he thought to be burning marihuana. Looking through an open hatch, Wilkins observed burlap-wrapped bales that proved to be marihuana. Respondent Villamonte-Marquez was on a sleeping bag atop of the bales. Wilkins arrested both Hamparian and Villamonte-Marquez and gave them *Miranda* warnings. A subsequent search revealed some 5,800 pounds of marihuana on the *Henry Morgan II*, stored in almost every conceivable place including the forward, mid, and aft cabins, and under the seats in the open part of the vessel.

A jury found respondents guilty of conspiring to import marihuana in violation of 21 U. S. C. § 963, importing marihuana in violation of 21 U. S. C. § 952(a), conspiring to possess marihuana with intent to distribute in violation of 21 U. S. C. § 846, and possessing marihuana with intent to distribute in violation of 21 U. S. C. § 841(a)(1). The Court of Appeals for the Fifth Circuit reversed the judgment of conviction, finding that the officers' boarding of the *Henry Morgan II* "was not reasonable under the fourth amendment" because the boarding occurred in the absence of "a reasonable

suspicion of a law violation." 652 F. 2d 481, 488 (1981). Because of a conflict among the Circuits and the importance of the question presented as it affects the enforcement of customs laws, we granted certiorari. 457 U. S. 1104 (1982).[3] We now reverse.

In 1790 the First Congress enacted a comprehensive statute "to provide more effectually for the collection of the duties imposed by law on goods, wares and merchandise imported into the United States, and on the tonnage of ships or vessels." Act of Aug. 4, 1790, 1 Stat. 145. Section 31 of that Act provided in pertinent part as follows:

> "That it shall be lawful for all collectors, naval officers, surveyors, inspectors, and the officers of the revenue cutters herein after mentioned, to go on board of ships or vessels in any part of the United States, or within four leagues of the coast thereof, if bound to the United States, whether in or out of their respective districts, for the purposes of demanding the manifests aforesaid, and of examining and searching the said ships or vessels . . . ." 1 Stat. 164.

This statute appears to be the lineal ancestor of the provision of present law upon which the Government relies to sustain

---

[3] There is no issue in this case concerning the activities of the officers once they boarded the *Henry Morgan II*. The only question presented to this Court concerns the validity of the suspicionless boarding of the vessel for a document inspection.

Respondents, however, contend in the alternative that because the customs officers were accompanied by a Louisiana state policeman, and were following an informant's tip that a vessel in the ship channel was thought to be carrying marihuana, they may not rely on the statute authorizing boarding for inspection of the vessel's documentation. This line of reasoning was rejected in a similar situation in *Scott* v. *United States*, 436 U. S. 128, 135–139 (1978), and we again reject it. Acceptance of respondents' argument would lead to the incongruous result criticized by Judge Campbell in his opinion in *United States* v. *Arra*, 630 F. 2d 836, 846 (CA1 1980): "We would see little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers."

the boarding of the vessel in this case. Title 19 U. S. C. § 1581(a) provides that "[a]ny officer of the customs may at any time go on board of any vessel . . . at any place in the United States or within the customs waters . . . and examine the manifest and other documents and papers . . . ."

The Government insists that the language of the statute clearly authorized the boarding of the vessel in this case. The respondents do not seriously dispute this contention, but contend that even though authorized by statute the boarding here violated the prohibition against unreasonable searches and seizures contained in the Fourth Amendment to the United States Constitution. We of course agree with respondents' argument that "no Act of Congress can authorize a violation of the Constitution." *Almeida-Sanchez* v. *United States*, 413 U. S. 266, 272 (1973). But we also agree with the Government's contention that the enactment of this statute by the same Congress that promulgated the constitutional Amendments that ultimately became the Bill of Rights gives the statute an impressive historical pedigree.[4] *United*

---

[4] Relying on the words "bound to the United States" in the 1790 statute and this Court's decision in *Maul* v. *United States*, 274 U. S. 501 (1927), the dissent contends that the Act of Aug. 4, 1790, § 31, 1 Stat. 164, did not grant any authority to board a vessel found in domestic waters. *Post*, at 600–601, n. 7. The dissent misreads the statute and the *Maul* decision. As noted, § 31 of the 1790 Act provides for the boarding of vessels found *"in any part of the United States,* or within four leagues of the coast thereof, if bound to the United States." (Emphasis supplied.) The dissent completely ignores that part of the statute which reads "in any part of the United States." Furthermore, the phrase "if bound to the United States" obviously qualifies only the phrase "within four leagues of the coast." It would make no sense whatsoever to say that the statute authorizes the boarding of vessels found in "any part of the United States" only so long as such vessels are "bound to the United States." The dissent also says that because § 48 of the Act of Aug. 4, 1790, authorized some searches without regard to location, it must be read as the only provision in the Act that allows boardings in domestic waters. *Post*, at 600–601, n. 7. Again the dissent misreads the statutory scheme. Section 48 expressly applies only to seizures of "goods, wares or merchandise subject to duty" and

*States* v. *Ramsey*, 431 U. S. 606 (1977).   As long ago as the decision in *Boyd* v. *United States*, 116 U. S. 616 (1886), this Court said:

> "The seizure of stolen goods is authorized by the common law . . . and the like seizures have been authorized by our own revenue acts from the commencement of the government.   The first statute passed by Congress to regulate the collection of duties, the act of July 31, 1789, 1 Stat. 29, 43, contains provisions to this effect.   *As this*

thought to be concealed on "any ship or vessel" or "any particular dwelling-house, store, building or other place."   Unlike § 31, § 48 does not purport to deal with boardings for inspection of documents.   In short, the two sections are concerned with different matters and nothing in one can be read to limit the other.

The dissent's reliance on the concurring opinion of Justice Brandeis in *Maul* seriously misreads that concurrence.   Where the dissent says that the concurrence "recognized" that it was only in 1922 that Congress purported to authorize suspicionless boardings of vessels not "bound to the United States," the dissent's reading of Justice Brandeis' language is imprecise, to say the least.   Observing that the 1922 amendments made two changes in the statutory law, he described one of them in these terms: "Unlike the earlier statutes, it did not limit to inbound vessels the right to board and search."   274 U. S., at 529.   Thus Congress in 1922 allowed searches to be made within four leagues of the coast of *any vessel,* whether inbound or not.   But this change in no way altered the separate provision in the same sentence of the 1922 statute retaining the authority to "go on board of any vessel or vehicle at any place in the United States . . . ."

Nor is anything in the Court's opinion in *Maul* to the contrary.   The Court was asked to decide whether the Coast Guard was authorized to seize an American vessel "on the high seas more than twelve miles from the coast."   *Id.,* at 503.   In tracing the history of statutory authorization for "seizures made on the high seas," *id.,* at 504, the Court properly noted that when acting pursuant to the Act of Aug. 4, 1790, and its pre-1922 descendants, such seizures were authorized only for inbound vessels within the 12-mile limit, *id.,* at 505–506.   The Court determined, however, that the Act of Mar. 2, 1799, § 70, 1 Stat. 678, authorized the seizure of American vessels beyond the 12-mile limit where the Coast Guard was acting pursuant to "any [law] respecting the revenue."   Nothing in the *Maul* decision even remotely purported to apply to the boarding of vessels in domestic waters.

*Act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as 'unreasonable,' and they are not embraced within the prohibition of the amendment."* *Id.*, at 623 (emphasis supplied; footnote omitted).

In holding that the boarding of the vessel without articulable suspicion violated the Fourth Amendment, the Court of Appeals relied on several of its own decisions and on our decision in *United States* v. *Brignoni-Ponce*, 422 U. S. 873 (1975), where we said:

"Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *Id.*, at 884.

We think that two later decisions also bear on the question before us.

In *United States* v. *Martinez-Fuerte*, 428 U. S. 543 (1976), we upheld the authority of the Border Patrol to maintain permanent checkpoints at or near intersections of important roads leading away from the border at which a vehicle would be stopped for brief questioning of its occupants "even though there is no reason to believe the particular vehicle contains illegal aliens." *Id.*, at 545. Distinguishing our holding in *United States* v. *Brignoni-Ponce, supra*, we said:

"A requirement that stops on major routes inland always be based on reasonable suspicion would be impractical because the flow of traffic tends to be too heavy to allow the particularized study of a given car that would enable it to be identified as a possible carrier of illegal aliens. In particular, such a requirement would largely eliminate any deterrent to the conduct of

well-disguised smuggling operations, even though smug-
glers are known to use these highways regularly." 428
U. S., at 557.

Three Terms later we held in *Delaware* v. *Prouse*, 440 U. S.
648 (1979), that "persons in automobiles on public roadways
may not for that reason alone have their travel and privacy
interfered with at the unbridled discretion of police officers."
*Id.*, at 663. We added that alternative methods, such as
spot checks that involve less intrusion, or questioning of all
oncoming traffic at roadblock-type stops, would just as
readily accomplish the State's objectives in furthering com-
pliance with auto registration and safety laws.

Our focus in this area of Fourth Amendment law has been
on the question of the "reasonableness" of the type of govern-
mental intrusion involved. "Thus, the permissibility of a
particular law enforcement practice is judged by balancing its
intrusion on the individual's Fourth Amendment interests
against its promotion of legitimate governmental interests."
*Delaware* v. *Prouse, supra,* at 654. See also *Camara* v.
*Municipal Court,* 387 U. S. 523 (1967); *Terry* v. *Ohio,* 392
U. S. 1 (1968); *Cady* v. *Dombrowski,* 413 U. S. 433 (1973);
*United States* v. *Brignoni-Ponce, supra; United States* v.
*Martinez-Fuerte, supra.* It seems clear that if the customs
officers in this case had stopped an automobile on a public
highway near the border, rather than a vessel in a ship chan-
nel, the stop would have run afoul of the Fourth Amendment
because of the absence of articulable suspicion. See *United
States* v. *Brignoni-Ponce, supra.* But under the overarch-
ing principle of "reasonableness" embodied in the Fourth
Amendment, we think that the important factual differences
between vessels located in waters offering ready access to
the open sea and automobiles on principal thoroughfares in
the border area are sufficient to require a different result
here.

The difference in outcome between the roving patrol stop
in *Brignoni-Ponce, supra,* and the fixed checkpoint stop in

*Martinez-Fuerte, supra,* was due in part to what the Court deemed the less intrusive and less awesome nature of fixed checkpoint stops when compared to roving patrol stops. And the preference for roadblocks as opposed to random spot checks expressed in *Delaware* v. *Prouse, supra,* reflects a like concern. But no reasonable claim can be made that permanent checkpoints would be practical on waters such as these where vessels can move in any direction at any time and need not follow established "avenues" as automobiles must do. Customs officials do not have as a practical alternative the option of spotting all vessels which might have come from the open sea and herding them into one or more canals or straits in order to make fixed checkpoint stops. Smuggling and illegal importation of aliens by land may, and undoubtedly usually does, take place away from fixed checkpoints or ports of entry, but much of it is at least along a finite number of identifiable roads. But while eventually maritime commerce on the inland waters of the United States may funnel into rivers, canals, and the like, which are more analogous to roads and make a "roadblock" approach more feasible, such is not the case in waters providing ready access to the seaward border, beyond which is only the open sea.

Respondents have asserted that permanent checkpoints could be established at various ports. But vessels having ready access to the open sea need never come to harbor. Should the captain want to avoid the authorities at port, he could carry on his activity by anchoring at some obscure location on the shoreline, or, as may have been planned in this case, the captain could transfer his cargo from one vessel to another. In cases involving such endeavors as fishing or water exploration, the crew of the vessel can complete its mission without any assistance.

Quite apart from the aforementioned differences between waterborne vessels and automobiles traveling on highways, the documentation requirements with respect to vessels are significantly different from the system of vehicle licensing

that prevails generally throughout the United States. A police officer patrolling a highway can often tell merely by observing a vehicle's license plate and other outward markings whether the vehicle is currently in compliance with the requirements of state law. See *Delaware* v. *Prouse, supra,* at 660–661. No comparable "license plates" or "stickers" are issued by the United States or by States to vessels. Both of the required exterior markings on documented vessels—the name and hailing port—as well as the numerals displayed by undocumented American boats, are marked on the vessel at the instance of the owner. Furthermore, in cases like this one where the vessel is of foreign registry it carries only the markings required by its home port. Here those markings indicated that the vessel was of Swiss registry, while in actuality it carried French documentation papers.

The panoply of statutes and regulations governing maritime documentation are likewise more extensive and more complex than the typical state requirements for vehicle licensing; only some of the papers required need explicit mention here to illustrate the point. All American vessels of at least five tons and used for commercial purposes must have a "certificate of documentation." In addition, vessels engaged in certain trades must obtain special licenses. While pleasure vessels of this size are not required to be documented, they are eligible for federal registration. See 46 U. S. C. § 65 *et seq.* (1976 ed., Supp. V). Many of these vessels must also submit to periodic inspection by the Coast Guard and a "certificate of inspection" must be kept on the vessel at all times. 46 U. S. C. §§ 399, 400. Smaller American vessels cannot be issued federal documentation papers, but under federal law each such vessel with propulsion machinery must have a state-issued number displayed on a "certificate of number" that must be available for inspection at all times. 46 U. S. C. § 1470. Vessels not required to carry federal documentation papers also may be required to carry a state-issued safety certificate. 46 U. S. C. § 1471.

While foreign vessels are not required to carry federal documentation papers, they are required to have a "manifest," which must be delivered to customs officials immediately upon arrival in this country. 19 U. S. C. § 1439. If a foreign vessel wants to visit more than one customs district, it must obtain a "permit to proceed" at its first port of call, with the exception that a foreign yacht need not obtain such a permit if it has been issued a "cruising license." 46 U. S. C. § 313; 19 U. S. C. § 1435. Any vessel departing American waters for a foreign port must deliver its "manifest" to Customs and obtain clearance. 46 U. S. C. § 91.

These documentation laws serve the public interest in many obvious ways and respondents do not suggest that the public interest is less than substantially furthered by enforcement of these laws. They are the linchpin for regulation of participation in certain trades, such as fishing, salvaging, towing, and dredging, as well as areas in which trade is sanctioned, and for enforcement of various environmental laws. The documentation laws play a vital role in the collection of customs duties and tonnage duties. They allow for regulation of imports and exports assisting, for example, Government officials in the prevention of entry into this country of controlled substances, illegal aliens, prohibited medicines, adulterated foods, dangerous chemicals, prohibited agricultural products, diseased or prohibited animals, and illegal weapons and explosives. These interests are, of course, most substantial in areas such as the ship channel in this case, which connects the open sea with a Customs Port of Entry. Cf. *United States* v. *Ramsey*, 431 U. S. 606 (1977). Requests to check certificates of inspection play an obvious role in ensuring safety on American waterways. While inspection of a vessel's documents might not always conclusively establish compliance with United States shipping laws, more often than not it will.[5]

---

[5] The dissent maintains that in lieu of the type of stop made in this case, it would be possible to enforce documentation laws by requiring vessels to

While the need to make document checks is great,[6] the resultant intrusion on Fourth Amendment interests is quite limited. While it does intrude on one's ability to make "'free passage without interruption,'" *United States* v. *Martinez-Fuerte*, 428 U. S., at 557–558 (quoting *Carroll* v. *United States*, 267 U. S. 132, 154 (1925)), it involves only a brief detention where officials come on board, visit public areas of the vessel, and inspect documents. Cf. *United States* v. *Brignoni-Ponce*, 422 U. S., at 880. "Neither the [vessel] nor its occupants are searched, and visual inspection of the [vessel] is limited to what can be seen without a search." *United States* v. *Martinez-Fuerte, supra,* at 558. Any interference with interests protected by the Fourth Amendment is, of course, intrusive to some degree. But in this case, the interference created only a modest intrusion.

We briefly recapitulate the reasons, set forth above in greater detail, which lead us to conclude that the Government's boarding of the *Henry Morgan II* did not violate the Fourth Amendment. In a lineal ancestor to the statute at issue here the First Congress clearly authorized the suspicionless boarding of vessels, reflecting its view that such boardings are not contrary to the Fourth Amendment; this gives the statute before us an impressive historical pedigree. Random stops without any articulable suspicion of vehicles away from the border are not permissible under the Fourth Amendment, *United States* v. *Brignoni-Ponce, supra; Dela-*

---

display identification markings more similar to automobile "license plates" and for the Coast Guard to maintain extensive records on shore that can be referred to by radio. Even assuming that these alternatives are feasible, Congress has chosen a different method. So long as the method chosen by Congress is constitutional, then it matters not that alternative methods exist. Cf. *Cady* v. *Dombrowski*, 413 U. S. 433, 447 (1973).

[6] Respondents suggest that even if the public interest is great in stopping commercial vessels, it is not so with "pleasure boats." The difficulties with such line-drawing are exemplified by this case. Respondents assert that they were in a "pleasure boat," yet they proved to be involved in a highly lucrative commercial trade.

*ware* v. *Prouse*, 440 U. S. 648 (1979), but stops at fixed checkpoints or at roadblocks are. *Ibid.* The nature of waterborne commerce in waters providing ready access to the open sea is sufficiently different from the nature of vehicular traffic on highways as to make possible alternatives to the sort of "stop" made in this case less likely to accomplish the obviously essential governmental purposes involved. The system of prescribed outward markings used by States for vehicle registration is also significantly different from the system of external markings on vessels, and the extent and type of documentation required by federal law is a good deal more variable and more complex than are the state vehicle registration laws. The nature of the governmental interest in assuring compliance with documentation requirements, particularly in waters where the need to deter or apprehend smugglers is great, is substantial; the type of intrusion made in this case, while not minimal, is limited.

All of these factors lead us to conclude that the action of the customs officers in stopping and boarding the *Henry Morgan II* was "reasonable," and was therefore consistent with the Fourth Amendment. The judgment of the Court of Appeals is

*Reversed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, and with whom JUSTICE STEVENS joins as to Part I, dissenting.

The Court today holds that this case is not moot despite the voluntary dismissal of the prosecution by the Government. It also holds that police on a roving, random patrol may stop and board any vessel, at any time, on any navigable waters accessible to the open sea, with no probable cause or reasonable suspicion to believe that there has been a crime or a border crossing, and without any limits whatever on their discretion to impose this invasion of privacy. Because I cannot agree with either holding, I dissent.

# I

It is long settled that a party may not seek appellate review when it has itself sought and obtained entry of a judgment against it, unless it does so solely as a device by which to obtain immediate appellate review of an interlocutory order. *E. g.*, *United States* v. *Procter & Gamble Co.*, 356 U. S. 677, 680–681 (1958); *United States* v. *Babbitt*, 104 U. S. 767 (1882); *Evans* v. *Phillips*, 4 Wheat. 73 (1819).

Yet that is precisely what the Court permits the Government to do in this case.[1] Respondents were convicted of drug violations and sentenced to prison. The Court of Appeals reversed the judgment on August 3, 1981, holding that the convictions rested on illegally obtained evidence. Rehearing was denied on October 19, and the mandate issued on October 29. On November 20, the Court of Appeals granted the Government's motion to recall the mandate and stay its reissuance until December 7, pending a petition for writ of certiorari in this Court. The Government, however, permitted that stay to expire without filing the petition, and the

---

[1] Consider this hypothetical: Peter brings a diversity suit against David, seeking damages for trespass and an injunction against further trespass. The jury awards damages to Peter. On post-trial motions, however, the district judge refuses to enter judgment on the verdict for damages or an injunction; instead, he orders a new trial because he concludes that the verdict rested on improper hearsay evidence. Peter's lawyer advises him that his chances on retrial are slim; without the supposed hearsay, he has virtually no evidence to support a key element of his case. He advises Peter to pursue an interlocutory appeal under 28 U. S. C. § 1292(a). But Peter decides not to bother further with the case; he files a stipulated dismissal of the complaint under Federal Rule of Civil Procedure 41(a)(1). Thereafter, however, Peter files a notice of appeal, contending that the district judge should have entered judgment on the jury verdict. When the court of appeals asks him about mootness, he asserts that the court should proceed to decide the hearsay issue, because if it holds for Peter it may vacate the dismissal of the complaint and reinstate the jury verdict.

Can there be any doubt that, in this hypothetical case, the court of appeals would throw Peter out on his ear? Yet there is no significant difference between Peter's conduct and that of the Government in this case.

mandate issued on December 8. On December 21, the Government moved voluntarily in the District Court for dismissal of the indictment under Federal Rule of Criminal Procedure 48(a), and the motion was granted the same day. Not until January 18, 1982, did the Government file its petition for certiorari in this Court.[2]

Rule 48(a) provides that the Government "may by leave of court file a dismissal of an indictment, information or complaint *and the prosecution shall thereupon terminate*" (emphasis added). No one has ever challenged the effectiveness of the District Court's order of dismissal, or sought to set it aside, either by a request for rehearing in that court or by direct review on appeal. Yet the Government, having itself permanently terminated this prosecution, now asks this Court to reinstate respondents' convictions—convictions for which there is no pending indictment and no extant criminal action. Neither the Government nor the Court provides any adequate explanation of how this is possible.

The Court relies primarily on cases holding that issuance of the mandate of a court of appeals does not necessarily moot a case. *Ante*, at 581–582, n. 2. That is ordinarily true enough, but it is quite beside the point. The act that terminated this case was not the issuance of the mandate (or the Government's failure to seek a further stay), but the dismissal of the indictment at the Government's request. The Court cites *Mancusi* v. *Stubbs*, 408 U. S. 204, 205–207 (1972), as support for the proposition that the Court may reinstate respondents' convictions despite the dismissal. Presumably the Court refers to our holding in *Mancusi* that "[p]etitioner's obedience to the mandate of the Court of Appeals and the judgment of the District Court does not moot this case." *Id.*, at 206 (footnote omitted).[3] The unspoken but necessary step in the

---

[2] The time for filing was extended by JUSTICE WHITE.

[3] The facts of *Mancusi* illuminate why that case does not control this one. There, New York had sentenced Stubbs as a second offender, based on an allegedly infirm prior Tennessee conviction. On appeal from a denial

Court's logic is the Government's assertion that "the indictment in this case was dismissed solely in order to comply with the court of appeals' mandate." Supplemental Brief for United States 3. That assertion, however, is patently false. Not one syllable of the Court of Appeals' mandate or opinion purported to require the District Court to dismiss the indictment, or to require the Government to move for dismissal. The Court of Appeals held only that respondents' convictions were infirm because based on inadmissible evidence; it remained open for the Government to retry them on proper evidence, or to seek further review in this Court. The Government points out that it had no other sufficient evidence, and hence as a practical matter it could not have retried respondents. In that circumstance a dismissal of the indictment was indeed a sensible response to the Court of Appeals' decision, *if the Government did not intend to proceed further in seeking to impose criminal liability on respondents.* But if, on the contrary, the Government intended to seek a reversal in this Court of the Court of Appeals' judgment, then there was no reason why it would or should terminate the prosecution by moving under Rule 48(a) for dismissal. Instead, it could, should, and would have proceeded in this Court, allowing the indictment to stand pending our disposition. Neither the

of federal habeas, the Court of Appeals held that the Tennessee conviction, and hence the New York sentence, were invalid; accordingly, acting on the Court of Appeals' mandate, the District Court granted a writ of habeas corpus, ordering that Stubbs be resentenced or released. Before our decision issued, the New York state court complied by resentencing Stubbs. We held that the case was not moot because, if we reversed, the State would be free to reimpose its earlier sentence on Stubbs. (As it happened, the second sentence was the same as the first, but it was still under appeal when our decision was rendered; thus, it was possible that the second sentence would be reversed, leaving the original sentence as the only basis on which New York could impose that punishment.) The key fact in *Mancusi* was that the State was absolutely required by the District Court's writ either to resentence Stubbs or to release him; it did not have the option, as the Government did in this case, of simply letting the matter rest pending decision by this Court.

Government nor the Court draws my attention to anything that would have foreclosed this course of action.[4]   Plainly, the Government's motion was based on a decision (presumably later changed) to let the case drop, contenting itself with deportation.

The Court points out that preliminary steps in a prosecution are merged into a conviction and sentence.   *Ante*, at 581–582, n. 2.   Again, this is true enough as a general rule, but it is hard to see how it provides any support for the Court's position.   The rule means simply that interlocutory steps are subject to attack on appeal from the final judgment; it has never been meant or taken to undermine the fundamental principle that an indictment is the necessary foundation of and predicate for a felony prosecution, conviction, or sentence.   On the contrary, it means just the opposite—that the indictment can be attacked on appeal from the conviction, and if it is defective, the entire conviction and sentence falls. Likewise, if the indictment is dismissed, everything that has been "merged" with it is necessarily included in the dismissal.   Where there is no valid indictment pending, "[i]t is of no avail . . . to say that the court still has jurisdiction of the person and of the crime; for, though it has possession of the person, and would have jurisdiction of the crime, if it were properly presented by indictment, the jurisdiction of the offence is gone, and the court has no right to proceed any further in the progress of the case for want of an indictment." *Ex parte Bain*, 121 U. S. 1, 13 (1887).[5]   Rule 48(a) is but a

---

[4] The Government suggests that the Speedy Trial Act, 18 U. S. C. § 3161(e) (1976 ed., Supp. V), somehow foreclosed this.   Supplemental Brief for United States 2, n. 1.   It is doubtful, however, that a judgment on which certiorari has been granted is "final" within § 3161(d)(2); alternatively, action on the petition for certiorari would likely constitute "other proceedings concerning the defendant" under § 3161(h)(1).   In any event, § 3161(e) applies only "[i]f the defendant is to be tried again."   The Government has disclaimed any intention of retrying respondents.

[5] *Salinger* v. *United States*, 272 U. S. 542, 549 (1926), hardly limits *Bain* to its facts, as the Court contends, *ante*, at 581–582, n. 2; even less does it

recognition of this principle: Once the indictment is dismissed, "the prosecution shall thereupon terminate." This prosecution has terminated, and this Court is entirely without power to revive it, or the convictions or sentences that arose out of it and died with it. Hence, because there is no nonadvisory relief that we may grant to the Government, the case should be vacated and remanded with instructions to dismiss as moot.

## II

Today, for the first time in the nearly 200-year history of the Fourth Amendment, the Court approves a completely random seizure and detention of persons and an entry onto private, noncommercial premises by police officers, without any limitations whatever on the officers' discretion or any safeguards against abuse. The Court makes no pretense that its issuance of this maritime writ of assistance is supported by any precedent approving such extraordinary and unregulated powers.[6] Instead, it correctly recognizes that

---

undermine the principle for which I cite the case. *Bain* held that the Fifth Amendment does not permit amendment of an indictment other than by a grand jury; *Salinger* held simply that a trial judge may "amend" an indictment by omitting a charge not supported by the evidence at trial. This unsurprising rule is entirely consistent with anything in either *Bain* or this dissent. It certainly does not in any way contradict *Bain*'s statement that a live, valid indictment is the *sine qua non* of any felony prosecution or sentence.

[6] The closest this Court has ever come to granting such unlimited police discretion is in one narrowly limited situation—that of border searches:

"Travellers may be . . . stopped in crossing an international boundary because of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in." *Carroll* v. *United States*, 267 U. S. 132, 154 (1925).

Yet at the same time, we have always stressed the uniqueness of the border-search rule, and have repeatedly pointed out that its rationale cannot acceptably be applied to any other situation:

"It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor and thus

the relevant precedents are those governing searches or stops of vehicles by police on random patrol or at fixed checkpoints. *Almeida-Sanchez* v. *United States,* 413 U. S. 266 (1973); *United States* v. *Brignoni-Ponce,* 422 U. S. 873 (1975); *United States* v. *Ortiz,* 422 U. S. 891 (1975); *United States* v. *Martinez-Fuerte,* 428 U. S. 543 (1976); *Delaware* v. *Prouse,* 440 U. S. 648 (1979). But those precedents cannot be read to support or permit today's holding, for not one of them holds or even hints that a police officer on roving patrol may stop, seize, enter, or search any vehicle, vessel, or person at the whim of the officer. Instead, the cases uniformly hold that any stop or search requires probable cause, reasonable suspicion, or another discretion-limiting feature such as the use of fixed checkpoints instead of roving patrols. If we

---

subject all persons lawfully using the highways to the inconvenience and indignity of such a search. [T]hose lawfully within the country, entitled to use the public highways, have a right to free passage without interruption or search unless there is known to a competent official authorized to search, probable cause for believing that their vehicles are carrying contraband or illegal merchandise." *Id.,* at 153–154.

See also, *e. g., Almeida-Sanchez* v. *United States,* 413 U. S. 266, 272–274 (1973).

The Government does not contend that the boarding in this case can be justified as a border search. Accordingly, the Court—correctly—does not argue that either the rule or the rationale of the border-search cases has any bearing on this case. In any event, a border search is, in most instances, a fixed-checkpoint stop, sharing the discretion-limiting features of all such stops. See *United States* v. *Ortiz,* 422 U. S. 891, 894–895 (1975); *United States* v. *Martinez-Fuerte,* 428 U. S. 543, 558–559 (1976); *Delaware* v. *Prouse,* 440 U. S. 648, 656–657 (1979); *infra,* at 603–605. When a border search does not occur at a regular port of entry, it can be made only if it is known that there has in fact been a border crossing. See 3 W. LaFave, Search and Seizure §§ 10.5(d), (e) (1978); cf. *United States* v. *Brignoni-Ponce,* 422 U. S. 873, 884 (1975) (Government's power, if any, freely to stop and question aliens cannot affect Fourth Amendment rights of citizens mistaken for aliens). Hence, the border-search rule does not represent any exception to our uniform insistence under the Fourth Amendment that the police may not be loosed upon the populace with no limits on their ability to stop, seize, or search.

are to reach the merits, therefore, our precedents compel an affirmance.

The Court freely admits that the limitations we have imposed on police discretion were necessary to our holdings in the vehicle-stop cases, *ante,* at 588, and that the seizure and boarding at issue in this case cannot pass muster under those precedents, *ibid.* Yet it upholds this seizure, concluding that there are differences between boats and cars sufficient to justify such a blatant departure from solid and recent constitutional precedent.[7] There are three basic flaws in the

---

[7] The Court also rests on its assertion that "[i]n a lineal ancestor to the statute at issue here the First Congress clearly authorized the suspicionless boarding of vessels, reflecting its view that such boardings are not contrary to the Fourth Amendment; this gives the statute before us an impressive historical pedigree." *Ante,* at 592; see *ante,* at 584–587. I cannot agree that every statute enacted by the First Congress must be presumed to be constitutional. See *Marsh* v. *Chambers,* 463 U. S. 783, 795 (1983) (BRENNAN, J., dissenting). Even granting this theory of constitutional adjudication, however, the Court's historical analysis is self-refuting. The 1790 statute on which it relies, quoted *ante,* at 584, is by its own terms limited to boardings and searches of ships *"if bound to the United States."* 1 Stat. 164 (emphasis added). By contrast, § 48 of the Act, which did authorize customs officers to board and search any vessel without regard to location or entry into the country, was expressly limited to vessels in which customs officers had *"reason to suspect* any goods, wares, or merchandise subject to duty shall be concealed." § 48, 1 Stat. 170 (emphasis added); cf. *Carroll, supra,* at 150–151. The Court attempts to explain away § 48, reasoning that § 48 authorized searches, whereas § 31 authorized only boardings for document checks. *Ante,* at 585–586, n. 4. Section 31, however, also authorized officers to *search* an inbound ship, with "free access to the cabin, and every other part of a ship or vessel." Unless § 48 (with its express requirement of reasonable suspicion for searches) is to be read out of the Act, § 31's broad grant of authority to board and search without suspicion must be read as applying only to ships entering the country—as the language "if bound to the United States" indicates. The section's further authorization to board and search vessels without suspicion "in any part of the United States" meant merely that customs officials could wait to search a ship until it reached port. In short, § 31 was a *border-search* statute, applicable only to vessels entering the country. See also n. 6, *supra.* Thus, as we recognized in *Maul* v. *United*

Court's reasoning. First, the Court's exclusive focus on available tools of investigation puts the cart before the horse; it completely overlooks the primary and overarching concern that has guided our previous decisions—our unqualified and consistent rejection of any "standardless and unconstrained discretion," *Prouse, supra,* at 661, that would subject our liberties to the whim of an individual police officer in the field. Second, the supposed factual differences are either insubstantial or of the Government's own making. And third, it is a non sequitur to reason that because the police in a given situation claim to need more intrusive and arbitrary enforcement tools than the Fourth Amendment has been held to permit, we may therefore dispense with the Fourth Amendment's protections.

## A

In *Almeida-Sanchez,* we held that police officers on a roving patrol must have probable cause to suspect that a vehicle contains illegal aliens or contraband before they may search it. In *Ortiz,* we held that the same rule governs searches of vehicles at fixed checkpoints. In either case, the severity of the intrusion and the selective discretion necessarily exercised by police in the field require that that discretion be limited by a requirement of probable cause:

> "This degree of discretion to search private automobiles is not consistent with the Fourth Amendment. A search, even of an automobile, is a substantial invasion of privacy. To protect that privacy from official arbitrariness, the Court has always regarded probable cause as the minimum requirement for a lawful search." *Ortiz, supra,* at 896 (footnote omitted).

---

*States,* 274 U. S. 501 (1927), it was not until the enactment of the present statute *in 1922* that Congress purported to authorize suspicionless boardings of vessels without regard to whether there had been any border crossing. *Id.,* at 505; see *id.,* at 521, 528–529 (Brandeis, J., concurring). Where, then, is the "impressive historical pedigree"?

In *Brignoni-Ponce* and *Martinez-Fuerte*, the Court addressed the limits on police officers' power to stop vehicles and question the occupants, without searching either vehicles or occupants. These cases were not governed by the probable-cause requirement of *Almeida-Sanchez* and *Ortiz* because the police procedures in question were considerably less intrusive than full vehicle searches. Nevertheless, we continued to insist, as we have always done, that there must be some meaningful check on the arbitrary discretion of the police.

In *Brignoni-Ponce*, the stop in question was made by Border Patrol officers on a roving patrol. We held that such stops are permitted only if the police have a reasonable suspicion that the vehicle contains illegal aliens. As in the vehicle-search cases, we rested primarily on the Fourth Amendment's command that police discretion be limited by independent constitutional constraints:

> "We are unwilling to let the Border Patrol dispense entirely with the requirement that officers must have a reasonable suspicion to justify roving-patrol stops. [T]he reasonableness requirement of the Fourth Amendment demands something more than the broad and unlimited discretion sought by the Government. . . . To approve roving-patrol stops of all vehicles in the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers. [I]f we approved the Government's position in this case, Border Patrol officers could stop motorists at random for questioning, day or night, anywhere within 100 air miles of the 2,000-mile border, on a city street, a busy highway, or a desert road, without any reason to suspect that they have violated any law." 422 U. S., at 882–883 (footnote omitted).

In *Martinez-Fuerte*, we held that Border Patrol officers may stop vehicles and question their occupants at fixed checkpoints without probable cause or reasonable suspicion. As the Court recognizes, *ante*, at 588–589, the reason why reasonable suspicion was required in *Brignoni-Ponce* but not in *Martinez-Fuerte* was the additional feature in the latter case that the stops took place at fixed checkpoints rather than on roving patrols. Fixed checkpoints have two major advantages, for Fourth Amendment purposes, over roving patrols: They decrease somewhat the intrusiveness of the stop, and they significantly channel and limit the discretion of the officers and the consequent potential for abuse.

> "[W]e view checkpoint stops in a different light because the subjective intrusion—the generating of concern or even fright on the part of lawful travelers—is appreciably less in the case of a checkpoint stop. . . .
>
> . . . . .
>
> "[C]heckpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law-abiding motorists, that the stops are duly authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops." 428 U. S., at 558–559.

See also *Ortiz*, 422 U. S., at 894–895.

In *Prouse*, we reaffirmed our holdings in *Brignoni-Ponce* and *Martinez-Fuerte* that stops of vehicles are permissible

*only* if made either at fixed checkpoints or on reasonable suspicion. *Prouse* involved a random, roving-patrol stop of a vehicle for a spot license-and-registration check. As in the prior cases, we relied on the more intrusive nature of random patrols as compared with fixed-checkpoint stops, 440 U. S., at 657, and on the ever-present danger of arbitrariness and abuse posed by the completely discretionary nature of random roving-patrol stops:

"The marginal contribution to roadway safety possibly resulting from a system of spot checks cannot justify subjecting every occupant of every vehicle on the roads to a seizure—limited in magnitude compared to other intrusions but nonetheless constitutionally cognizable— at the unbridled discretion of law enforcement officials. To insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion 'would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . .' *Terry* v. *Ohio*, 392 U. S. [1,] 22 [(1968)]. When there is not probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations—or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered—we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver. This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Id.*, at 661 (footnote omitted).

In short, every one of the vehicle-stop precedents on which the Court relies, from *Almeida-Sanchez* to *Prouse*, requires

that a stop or search be supported by either probable cause, reasonable suspicion, or another discretion-limiting feature such as use of fixed checkpoints. But the Court purports to draw from these cases a rule that the police may board any boat, at any time, on any "waters offering ready access to the open sea," *ante*, at 588,[8] with nothing more to guide them than their unsupported hunch, whim, or even their desire to harass or to flaunt their authority. The boarding at issue here was made by officers on a roving patrol, concededly without any reasonable suspicion of criminal activity. To uphold it is flatly contrary to the square holdings of our cases.

Nor can this departure from *Brignoni-Ponce* and *Prouse* be justified by a difference in degree of intrusiveness. The Court asserts that its rule involves "only a modest intrusion," *ante*, at 592 (although, the Court admits, not a "minimal" one, *ante*, at 593). The intrusion is modest, if the comparison is made to a full, detailed search of a vessel and its occupants, which could only be made on probable cause. But the Court's bland assertion masks the fact that the intrusion at issue here is significantly more severe than those in *Brignoni-Ponce* and *Prouse*, which we held permissible only on reasonable suspicion. As in those cases, the stop is made on a roving patrol, so that it cannot claim the more limited intrusiveness of fixed checkpoints. Also as in those cases, there is a large noncriminal maritime traffic that may henceforth be stopped and boarded at random in nearly any waters, at any time, without any reason to suspect that there has been any violation of law. Unlike the earlier cases, however, it does not involve a mere stopping and questioning, cf. *infra*, at 608, but an actual boarding of a private vessel—more similar to entry of a private house than to the

---

[8] Since the Court's holding rests primarily on the need to suppress maritime smuggling, it is necessarily limited geographically to waters accessible to the open sea. The same reasoning requires that today's rule be limited to such vessels as are capable of having entered the country from the open sea.

stops in *Brignoni-Ponce* and *Prouse*.   Further, despite the Court's enthusiasm for identifying differences between boats and cars, it overlooks one obvious difference—the greater expectation of privacy that persons enjoy on boats.   A boat, unlike a car, quite often serves as an actual dwelling for its owners, as was apparently true in this case.   Even where the owners do not live aboard full-time, a boat may serve essentially the same function as a summer vacation cottage— a residence, albeit a temporary one.   In either instance, the occupant would quite reasonably suppose that he was entitled to remain undisturbed by arbitrary government authority. The Court, however, sweeps this expectation aside without a thought.[9]

Today's holding thus runs roughshod over the previously well-established principle that the police may not be issued a free commission to invade any private premises without a requirement of probable cause, reasonable suspicion, or some other limit on their discretion or abuse thereof.   Here, as in

---

[9] The Court points to the system of safety and documentation regulation that vessels must obey.   As we pointed out in *Prouse*, however, the same is true of automobiles, but that does not justify random stops of cars without reasonable suspicion.

"The 'grave danger' of abuse of discretion does not disappear simply because the automobile is subject to state regulation resulting in numerous instances of police-citizen contact.   '[I]f the government intrudes . . . the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards.'"   440 U. S., at 662 (citations omitted), quoting *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 312–313 (1978).

The Court also disparages the significance of the privacy interest in boats by pointing out that, in this case, a private pleasure boat turned out to be engaged in the business of smuggling.   *Ante*, at 592, n. 6.   This is precisely the sort of *post hoc* reasoning, justifying a Fourth Amendment violation by its results, against which we have warned.   *E. g.*, *Martinez-Fuerte*, 428 U. S., at 565.   Presumably the Court would not assert that a random, warrantless entry of a private residence on land would be upheld because it turned out that the residence was also being used for some criminal enterprise.

*Prouse*, "[I] cannot conceive of any legitimate basis upon which [a customs officer] could decide that [boarding] a particular [vessel] for a spot check would be more productive than [boarding] any other [vessel]. This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." 440 U. S., at 661.

## B

The Court attempts to justify its departure from *Brignoni-Ponce* and *Prouse* by pointing to supposed special law enforcement problems in the maritime setting. I do not accept the premise that such problems permit us to dispense with the Fourth Amendment's protections against arbitrary police intrusion, see Part II–C, *infra*. In any event, I am unpersuaded that any sufficiently severe problems have been demonstrated here.

The Court asserts that it is not practicable on water for the police to set up fixed checkpoints such as we approved in *Martinez-Fuerte* and *Prouse*. The boarding in this case, however, took place in the Calcasieu Ship Channel, "a separate thoroughfare . . . which all vessels moving between Lake Charles and the open sea of the Gulf must traverse." *Ante*, at 582. The Channel bears a strong functional resemblance to the limited-access interstate highways on which the Border Patrol sets up its fixed checkpoints, located so as to funnel most of the relevant traffic through the checkpoints. See *Martinez-Fuerte*, 428 U. S., at 553. As an opportunity for effective fixed-point inspection, it compares quite favorably to anything likely to have been available to the New Castle County, Delaware, patrolman who made the illegal random stop in *Prouse*. Yet, despite the predictable difficulty of setting up effective checkpoints or even temporary roadblocks in an ordinary urban or suburban network of highways and streets, we held in *Prouse* that random, roving-

patrol traffic stops of vehicles are unconstitutional in any setting. There is no justification for departing from that rule in our considerably less extensive system of inland navigable waterways.[10]

Checkpoints aside, there is no apparent reason why random stops are really necessary for adequate law enforcement. In *Prouse*, we noted that many, if not all, safety defects are readily detectable by visual means, without any necessity for random stops. 440 U. S., at 660. The same is true of vessels. We also noted that the law enforcement interests at stake could be substantially vindicated by stopping drivers who commit traffic violations. *Id.*, at 659–660. Again, the same is true of vessels. "Smuggling is commonly attended by violation of the navigation laws." *Maul* v. *United States*, 274 U. S. 501, 525 (1927) (Brandeis, J., concurring). Similarly, as we noted in *Brignoni-Ponce:* "[T]he nature of illegal alien traffic and the characteristics of smuggling operations tend to generate articulable grounds for identifying violators. Consequently, a requirement of reasonable suspicion for stops allows the Government adequate means of guarding the public interest and also protects residents of the border areas from indiscriminate official interference." 422 U. S., at 883. The case law shows that the same is true of the maritime smuggling trade.[11]

---

[10] The Court argues that fixed checkpoints are impossible on the open sea. *Ante*, at 589. Assuming this is true, however, it cannot provide any explanation of why random, suspicionless stops are necessary or permissible on inland waterways such as the Calcasieu Ship Channel. Nor does it explain why, if random stops by roving patrols are necessary, they could not be subjected to some sort of neutral selection system that would decrease the opportunity for arbitrariness or harassment. See *Prouse*, 440 U. S., at 663–664 (BLACKMUN, J., concurring).

[11] *E. g.*, *United States* v. *Glen-Archila*, 677 F. 2d 809, 813–814 (CA11 1982); *United States* v. *Green*, 671 F. 2d 46, 53–54 (CA1 1982); *Blair* v. *United States*, 665 F. 2d 500, 505 (CA4 1981); *United States* v. *Streifel*, 665 F. 2d 414, 424 (CA2 1981); *United States* v. *D'Antignac*, 628 F. 2d 428, 434 (CA5 1980); *United States* v. *Williams*, 617 F. 2d 1063, 1077, 1085 (CA5

The Court further rests on the fact that vessels, unlike cars, do not carry uniform license plates giving visible evidence of compliance with registration laws. It identifies no reason, however, why that is a necessary or permanent state of affairs. It would be manifestly easy and comparatively inexpensive to provide boats with such means of identification. It is unseemly at best for the Government to refrain from implementing a simple, effective, and unintrusive law enforcement device, and then to argue to this Court that the absence of such a device justifies an unprecedented invasion of constitutionally guaranteed liberties. Moreover, assuming that some check of documents is necessary, the Court does not explain why that need invariably requires the police to board a vessel, rather than to come alongside or to request that someone from the vessel come on board the police vessel. Use of ship-to-shore radio, too, contributes considerably to the Government's ability to keep track of documentation and registration matters. Cf. *Florida* v. *Royer*, 460 U. S. 491, 504–506 (1983) (plurality opinion); *id.*, at 511–512, and n. (BRENNAN, J., concurring in result).

## C

Even if the Court could make a more persuasive showing that there are important differences between vehicles and vessels as to the difficulty of law enforcement, I would not agree with its holding. It simply does not follow that, because the police in particular situations dislike limitations placed on their powers of search and seizure, we may therefore sanction an unprecedented invasion of constitutionally protected liberties.

"The needs of law enforcement stand in constant tension with the Constitution's protection of the individual

1980); *United States* v. *Zurosky*, 614 F. 2d 779, 790 (CA1 1979); *United States* v. *Serrano*, 607 F. 2d 1145, 1149 (CA5 1979); *United States* v. *Castro*, 596 F. 2d 674, 675–676 (CA5 1979); *United States* v. *Whitmire*, 595 F. 2d 1303, 1306 (CA5 1979).

against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards. It is well to recall the words of Mr. Justice Jackson, soon after his return from the Nuremberg trials:

"'These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.' *Brinegar* v. *United States*, 338 U. S. 160, 180 [(1949)] (Jackson, J., dissenting)." *Almeida-Sanchez*, 413 U. S., at 273–274.

## III

In dissent in *Martinez-Fuerte*, I expressed my fear that the Court's decision was part of a "continuing evisceration of Fourth Amendment protections against unreasonable searches and seizures." 428 U. S., at 567. The majority chided me for my rhetoric and my "unwarranted concern," pointing out that its holding was expressly and narrowly limited: "Our holding today, approving routine stops for brief questioning . . . is confined to permanent checkpoints." *Id.*, at 566, n. 19. Today the Court breaks that promise. I dissent.