**UNITED STATES of America**

**v.**

**Darrell MASON, Defendant.**

**Crim. No. 89–479.**

United States District Court, District of Columbia.

April 10, 1990.

Jeffrey R. Ragsdale, Asst. U.S. Atty., Washington, D.C., for Government.

John J. Carney, Washington, D.C., for defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This case is before the Court on defendant Darrell Mason's motion to suppress evidence seized from his apartment on October 25, 1989. It is defendant's contention that the search of his apartment violated the Fourth Amendment. According to defendant, the police had no basis for entering his apartment without a warrant. Defendant also argues that any consent he gave to the police was involuntary. The government opposes defendant's motion maintaining that the initial warrantless entry into the apartment was reasonable in light of the exigent circumstances at the time. The government further contends that the subsequent entry and search of the defendant's apartment was only undertaken after a valid written consent was obtained.

After reviewing the defendant's Motion to Suppress, the Government's response

thereto, and after hearing the testimony of fourteen witnesses,[1] this Court is prepared to rule on the defendant's motion.

## FINDINGS OF FACT

The essential facts of this case are not in dispute. On October 25, 1989, several officers of the District of Columbia Metropolitan Police Department responded to an emergency call for assistance at 3107 Naylor Road, S.E., Washington, D.C. Upon arriving at this location, the officers learned that a shooting had occurred and that an individual had been wounded and was in apartment # 301. The victim turned out to be the defendant Darrell Mason. The officers proceeded to interview the defendant to determine what had happened. The defendant advised the officers that when he attempted to enter his apartment # 203 two masked individuals suddenly opened the door from the inside and demanded money from the defendant. The defendant's girlfriend, who had accompanied him, ran once this confrontation began. The defendant attempted to get away by running up the stairs of the apartment building. Shots were fired and the defendant was struck in the lower leg.

The defendant managed to evade his attackers and successfully reached the third floor. The occupant of apartment # 301, Tommie Hewitt, who had been alerted by the sound of gunfire and shouts in the hallway, opened the door to his apartment and pulled the defendant inside. It was Mr. Hewitt who placed a call to 911 and advised that shots had been fired and that an ambulance would be needed. These events occurred between 9:00 and 9:15 p.m. on the night of October 25, 1989.

The police and ambulance personnel arrived on the scene at approximately 9:30 p.m. The police officers went directly to apartment # 301 where they interviewed the defendant to determine what had occurred. After learning that the shooting had taken place in the corridor outside the defendant's apartment and that the gunmen had alighted from within the apartment, the officers proceeded to the second floor and apartment # 203 to investigate. In the meantime, the defendant was taken by emergency vehicle to Southeast Hospital.

According to Officer Michael Currie, when the officers reached apartment # 203, they found the door ajar and heard noises coming from within the apartment.[2] The officers drew their weapons, entered the apartment, and proceeded to quickly search each room to determine whether any of the attackers were hiding within the apartment. The officers did not find anyone in the apartment, but they did discover that the source of the noise was either a radio or the television.[3]

After assuring themselves that no one was hiding within the apartment, the officers secured the apartment and called for a crime scene investigator. At approximately 9:45 p.m., crime scene officer Rupert Knowles arrived at apartment # 203. He testified that after being briefed by other officers as to what had occurred he asked whether a consent to enter apartment # 203 had been obtained from the victim, Mr. Mason. After being advised that no such consent had been obtained, Officer Knowles requested Detective Gatewood to go to the hospital to try to obtain Mr. Mason's consent. While waiting to hear from Detective Gatewood, Officer Knowles proceeded to inspect the hallway area. During his examination of the scene, he found expended shell casings on the second floor stairwell. In addition, other shells were found in the stairwells between the

---

1. The Government offered six (6) witnesses and the defendant called eight (8) witnesses.

2. Witnesses presented by the defense testified that the door was locked and that the officers broke it down by using a ram. This Court credits the testimony of the officers. As crime scene investigator officer Rupert Knowles testified, the lock on the apartment door had been forcibly opened. This is entirely consistent with the defendants own testimony that the perpetrators had come from within his apartment.

3. Although it is unclear from the testimony whether a radio or television was the source of the noise in the apartment, this Court credits the testimony of the officers that they did hear noise emanating from apartment # 203.

second and third floors. He also located a bullet hole in the door of apartment # 301.

It was not until approximately 10:45 p.m. that Officer Knowles was advised by Detective Gatewood via radio transmission that a consent to examine the apartment had been obtained. When so advised, Officer Knowles entered the apartment to look for evidence concerning the shooting. It was Officer Knowles' belief that a burglary had taken place in apartment # 203 and that Mr. Mason had surprised the burglars when he arrived home. With this in mind, Officer Knowles and his partner Officer Genise began to look through the apartment for evidence which would hopefully help to identify the perpetrators. Fingerprints and photographs were taken in every room.

While in one of the bedrooms, Officer Knowles came across a plastic bag which appeared to contain a controlled substance. The bag was found protruding out from under one of the pillows on the top bunk bed. Officer Knowles testified that the substance appeared to be a large cake of crack cocaine. Officer Knowles continued his search and discovered three other items of significance: 1) a locked safe on top of one of the beds; 2) 74 small baggies containing a greenish substance; and 3) traces of a white powder were found in an ashtray along with a single-edge razor blade.

Officer Knowles took control of the packages which he believed to contain controlled substances. Officer Knowles did not, however, attempt to open the locked safe. Rather, he went back to Detective Gatewood and advised him that it would be appropriate to either obtain a search warrant or another consent before opening the safe. Detective Gatewood thought it proper to contact a vice-officer since a significant quantity of "drugs" had been discovered in the apartment. Accordingly, vice officer Charles Porter was called to apartment # 203.

Officer Porter arrived at approximately twenty minutes to 11:00 p.m. Upon entering apartment # 203, he encountered Officer Knowles and a young woman who he later learned was Mr. Mason's sister, Jacqueline Tate. Ms. Tate had come to the apartment after having learned that her brother had been injured. While Ms. Tate was in the apartment, the telephone rang and she answered it. The phone call was from Mr. Mason who was awaiting treatment at the hospital. Officer Porter asked to speak with Mr. Mason. Officer Porter got on the phone and advised Mr. Mason that the police had located a safe and that they wanted to open it. He further advised Mr. Mason that there were two options available: 1) the police could obtain a search warrant; or 2) Mr. Mason could consent to it being opened. After the conversation ended, Officer Porter and Detective Gatewood left to see Mr. Mason at Southeast Hospital to obtain his consent and the key to the safe.

The officers arrived at Southeast Hospital at approximately 11:00 p.m. The officers encountered Mr. Mason, who was seated in a wheel chair, at the registration counter. Although Mr. Mason had been shot in the leg, his wound was not life threatening. In order to meet with him privately, the officers brought him into a room near the rear of the registration area and presented him with a second consent form for his signature. Officer Porter testified that he "explained ... everything to make sure that he was not coerced and everything as far as the consent to search." Porter, Trans. March 2, 1990, at 36. Mr. Mason signed the consent and provided the officers with the key to the safe. The officers returned to apartment # 203 and opened the safe. Several ziplock bags containing a white rock substance and approximately $1000.00 in cash were discovered. After this discovery was made, officers again returned to the hospital and placed Mr. Mason under arrest. At that point, for the first time, Mr. Mason was advised of his constitutional rights.

## CONCLUSIONS OF LAW

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no War-

rants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized ..." The Supreme Court has consistently held that the Fourth Amendment only prohibits *unreasonable* searches and seizures. *See Maryland v. Buie*, —— U.S. ——, ——, 110 S.Ct. 1093, 1095, 108 L.Ed.2d 276 (1990); *Skinner v. Railway Labor Executives' Assn.*, —— U.S. ——, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989). In evaluating the reasonableness of a challenged governmental action, it is necessary to balance the intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. *United States v. Villamonte–Marquez*, 462 U.S. 579, 588, 103 S.Ct. 2573, 2579, 77 L.Ed.2d 22 (1983); *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). A search of a house, apartment, or office is generally unreasonable without a warrant issued on probable cause. The Court has consistently expressed a preference for the use of search warrants. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). "Resort to the warrant process, the Court has declared, is to be preferred because it 'interposes an orderly procedure' involving 'judicial impartiality' whereby 'a neutral and detached magistrate' can make 'informed and deliberate determinations' on the issue of probable cause." 1 LaFave, Search & Seizure, § 3.1(b), 548–49 (1987) (citations omitted).

### A. The Initial Warrantless Entry

■ Defendant first argues that the police officers violated his Fourth Amendment rights when they initially entered his apartment without a warrant. Although the testimony elicited at the suppression hearing failed to establish that the officers who initially entered the apartment found any narcotics, defendant contends that this

can not be reconciled with the testimony of those officers who subsequently entered the apartment and who stated they saw narcotics in "plain view" on the bed in what later turned out to be the defendant's room.[4] Based on the record, this argument is without merit. The officers who entered the apartment in search of the gunmen could indeed have missed seeing the narcotics. They were not in search of drugs, rather they were after the gunmen.

The officers had ample justification for entering the apartment without a warrant. Courts have consistently held that officers may enter a dwelling without a warrant when confronted with exigent circumstances. 2 LaFave § 6.6, at 697. As Chief Justice (then Judge) Burger declared in *Wayne v. United States:*

[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of 'dead bodies,' the police may find 'bodies' to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is *to act,* not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response. A myriad of circumstances could fall within the terms 'exigent circumstances' ..., e.g., smoke coming out a window or under a door, the sound of gunfire in the house, threats from the inside to shoot through the door

---

**4.** Apparently, it is defendant's contention that the search for the alleged perpetrators was a mere subterfuge used by the officers in order to gain entry and to search the defendant's apartment. However, this is totally inconsistent with the facts. The police were acting in the best

tradition of their office. They were simply looking for the individuals who shot the defendant. There is simply no evidence to support a finding that the officers were in search of narcotics when they initially entered the defendant's apartment.

at police, reasonable grounds to believe an injured or seriously ill person is being held within.

318 F.2d 205, 212 (D.C.Cir.1963). Here, it is clear that the officers who entered the defendant's apartment had ample justification to see if the gunmen were still in the apartment. Moreover, the "protective sweep" that the officers conducted was quite restricted in its temporal and spatial dimensions. Defendant relies heavily on *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), for his argument that a warrantless search of a crime scene is unconstitutional. *Mincey,* however, is easily distinguishable from this case. In *Mincey,* the Supreme Court held that there is no "murder scene" exception to the Fourth Amendment's warrant requirement. In reaching this conclusion, the Court was concerned by the exhaustive and intrusive nature of the search that was undertaken in that case. The officers in *Mincey* took control of the apartment where the murder had occurred and remained there for four days. During that period, without a warrant, the officers examined and inventoried every item in the apartment and two to three hundred objects were seized. "The officers opened drawers, closets, cupboards, and inspected their contents; they emptied clothing pockets; they dug bullet fragments out of the walls and floors; they pulled up sections of the carpet and removed them for examination." *Id.* at 389, 98 S.Ct. at 2411. The *Mincey* Court, however, specifically recognized that there may be circumstances when officers must be allowed to make a prompt warrantless search of an area to see if a person is hurt or if a perpetrator is still on the premises. *Id.* at 393, 98 S.Ct. at 2413. Such warrantless searches must be "strictly circumscribed by the exigencies which justify its initiation." *Id.* (quoting *Terry v. Ohio,* 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882–83, 20 L.Ed.2d 889 (1968)). The challenged search in the instant case was so circumscribed. The testimony elicited from both government and defense witnesses makes it clear that within minutes after arrival and hearing noises from within the apartment the officers entered the defendant's apartment with firearms drawn, quickly searched to see if any of the perpetrators were there, and promptly exited. According to all the testimony, the officers remained in the apartment for only five to ten minutes. Such an intrusion in light of the existing exigency does not constitute a Fourth Amendment violation.

### B. *Consent*

■ Defendant also argues that the officers' subsequent search of apartment # 203 and the defendant's safe were unconstitutional because the defendant's consent was involuntary. Defendant advances two bases in support of this argument: 1) due to the defendant's lack of education and reading skills he was unable to understand the consent he was asked to sign; and 2) the defendant's consent was not knowing and voluntary since he was in pain and had not been provided with medical attention until after both consent forms had been signed.

In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court ruled that the issue of voluntariness "is a question of fact to be determined from the totality of the circumstances." *Id.* at 227, 93 S.Ct. at 2048. The Court went on to note that the "Fourth and Fourteenth Amendments require that consent not be coerced, by explicit or implicit means, by implied threat or covert force. For no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed." *Id.* at 228, 93 S.Ct. at 2048.

This Court finds that the defendant's reading skills were not inadequate and that he fully understood the two one page consent forms he was asked to sign. Although defendant only has a tenth grade education, he is a young man of better than average intelligence. Indeed, defendant testified that he had successfully passed a written driver's license examination. Given these facts, this Court concludes that the defendant understood what he was being asked to do.

**40**

Defendant's second contention is similarly without merit. The defendant was suffering from a gun shot wound to the ankle at the time he was asked to sign the consent forms. Although the defendant may have been in pain, it is clear that he was alert and capable of making the decisions he did. The defendant was at all times coherent. Indeed, while being taken from his apartment building, defendant had the presence of mind to toss his keys to a friend and to make certain requests of her. Further evidence that the defendant was coherent and capable of making decisions is the fact that he called his apartment while he was waiting to be treated and that he carried on a conversation with his sister and Officer Porter.

### C. *Conclusion*

Given the entire record, this Court concludes that the defendant was entirely capable of understanding the consent forms and that his decision to sign those forms was made voluntarily. This Court is convinced that the constitutional rights of the defendant were not violated by the police. Indeed, I am impressed by the professionalism demonstrated by the police throughout this entire incident.

Accordingly, the evidence seized in this case will not be suppressed.