**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Luis Armando VALDEZ–GONZALEZ,
Victor Arguelles–Rodriguez,
Defendants–Appellees.**

Nos. 89–10274, 89–10330.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 15, 1990.

Decided Feb. 19, 1992.

---

J. Bert Vargas, Asst. U.S. Atty., Tucson, Ariz., for plaintiff-appellant.

Jacqueline Marshall, Ralls, Bruner, Valenzuela & Marshall, P.C., Edward H. Laber, Tucson, Ariz., for defendants-appellees.

Before TANG, NORRIS and FERNANDEZ, Circuit Judges.

TANG, Circuit Judge:

The government appeals the Arizona district court's downward departures from the Sentencing Guidelines in sentencing two Mexican citizens for possession with intent to distribute marijuana. At sentencing, the district court held that the relative blame-

lessness of drug "mules" like the defendants was a mitigating factor either not adequately taken into account by the Guidelines or was present to a degree substantially in excess of that which ordinarily is involved in the offense. The district court then departed downward from the applicable Guidelines range. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Valdez–Gonzalez*

Luis Armando Valdez–Gonzalez ("Valdez") is a Mexican citizen from Sonora, Mexico. He earned a living for his wife and four children selling clothes in Sonora from the back of a truck. In November 1988, a Mexican known to Valdez only as "Ruben" promised him $2,000 to pick up and drive a car with an unknown amount of marijuana in it from Douglas to Tucson, Arizona. Valdez accepted the offer. On November 24, 1988, the United States Border Patrol arrested Valdez in Benson, Arizona with the car and marijuana. Valdez had no prior criminal record in either Mexico or the United States.

Valdez pleaded guilty to the charge on which he was indicted, possession with intent to distribute more than fifty but less than 100 kilograms of marijuana, in violation of 21 U.S.C. § 841. The plea agreement stipulated to a reduction of the base offense level under the Guidelines for Valdez's "minimal participation" in the offense, resulting in a maximum sentence of twenty-seven months. Rejecting the supposition that Valdez was a "minimal participant," the preparer of the Presentence Report recommended a Guidelines sentencing range of forty-one to fifty-one months.

At sentencing, the district court adopted the recommended Guidelines sentencing range of 41 to 51 months, but departed downward, sentencing Valdez to eight months in prison and three years of supervised release. The sentencing court explained its reasons for downward departure from the Guidelines sentence as follows:

> THE COURT: Well, I have some mixed emotions about Mr. Valdez' sentence. I just had a couple of sentencings before him this morning where, due to the circumstances, I accepted a plea agreement that provided one for probation, and the other I am considering house arrest. So when you compare all these cases, I have a hard time rationalizing a lengthy term of incarceration for Mr. Valdez.

> \* \* \* \* \* \*

> If I depart, and I have given reasons, I have stated what happened here in two other sentencings this morning. I am trying to have the sentencings be as fair as possible in an over all picture, trying to be fair with every defendant, and I can't see sentencing this man to a longer term than eight months in view of the other sentences that I imposed this morning that were plea agreements, and your office [the United States Attorney's office] was part of those.

> I am not criticizing them, but if we are going to do one thing, let's do it for everybody, or let's stay within a range that is fair. You can't put everything in a computer and come out with the proper sentence. You have to consider each case individually. But in all these cases, we file a statement of reasons for the sentence that we are imposing, and one of the reasons that I am departing in this case is that obviously, the [Sentencing] commission had no way of considering the conditions along the Mexican border where these people are starving to death, and being offered all kinds of money to drive a car across the border, or take it somewhere. He might have five pounds of marijuana, or he might have something in a quantity that makes him susceptible to a mandatory sentence. And I am pleased to see that the U.S. Attorney's Office is not going along with the amount.

> For example, these ["]mules["] where each one is packing 40 pounds, and you have 10 ["]mules["]. It is totally unfair to impose mandatory sentences on those people. And I think that is enough reasons, and if the Ninth Circuit wants to say that is not enough valid reasons, you

know, you [the United States Attorney] are entitled to appeal.

The government timely appealed the downward departure for Valdez.

## B. *Arguelles–Rodriguez*

Victor Arguelles–Rodriguez ("Arguelles") is also a Mexican citizen from Sonora, Mexico. He lived with his girlfriend's family in Sonora and worked as a temporary manual laborer and field hand. While seeking work in the United States, Arguelles and his friend and codefendant, another Mexican citizen, were approached by an unknown person promising them $1,000 apiece to drive a car with marijuana in it from Sasabe to Phoenix, Arizona. On January 16, 1989, Border Patrol agents stopped and apprehended Arguelles and his codefendant with the car loaded with marijuana.

Arguelles pleaded guilty to the charge on which he was indicted, possession with intent to distribute 190 pounds of marijuana, in violation of 21 U.S.C. § 841. Arguelles had no previous criminal record. The plea agreement stipulated to a Guideline sentencing range of thirty-three to forty-one months. The preparer of the Presentence Report calculated the Guideline range at forty-one to fifty-one months imprisonment.

At sentencing, 1989, the district court—the same court that had sentenced Valdez—again adopted the recommended Guidelines range and departed downward, sentencing Arguelles to fifteen months in prison and three years of supervised release. The district court explained its reasons for the downward departure as follows:

THE COURT: Let me tell you, and you can take this message back to your office [the United States Attorney's office]: I sit here and I sentence people—I think I have 10 for next week; I sentence four or five a day; it is just a horrendous problem. I don't disagree that it is a problem, and one of the problems that I see. I think it is my job to see that justice is meted out fairly, and that's what the guidelines are trying to do—

supposedly trying to do. And there seems to be a lack of coordination in your office on how these cases are handled.

I sentenced five men the other day in a gigantic conspiracy. I mean these guys were out here unloading marijuana from planes. And two of the plea agreements provided for probation. And you want these 18, 21–year old guys to get 27 months when your office comes in here and makes deals suggesting probation or three years for guys who are involved in giant conspiracies involving millions of dollars.

Maybe your office doesn't see it, because you each handle different cases, and have different philosophies, but I see it every day. And as long as I have anything to say about it, justice is going to be handed out on an even basis. I don't care if they are from Mexico, Canada, or the United States. We are going to handle it the way I see, and the way I think is right and fair.

The district court's reasons for downward departure in sentencing Arguelles parallel its reasons for downward departure in sentencing Valdez. The government also timely appealed the downward departure for Arguelles, and it argues the cases together.

## JURISDICTION

Both Valdez and Arguelles have served completely the sentences imposed by the district court and have since been deported to Mexico. No one knows the defendants' whereabouts. Although their sentences include supervised release, Valdez and Arguelles are under no obligation to report to a probation officer since they are not in this country. Should either Valdez or Arguelles be rearrested in the United States, their supervised release time would be converted to incarceration time. Because the contingency of Valdez' and Arguelles' reentry and rearrest is speculative, counsel for Valdez and Arguelles argue that the appeal is moot.

The Supreme Court's decision in *United States v. Villamonte–Marquez*, 462 U.S. 579, 581 n. 2, 103 S.Ct. 2573, 2575 n. 2, 77 L.Ed.2d 22 (1983), however, instructs us to proceed to the merits. In *Villamonte*, a district court convicted two foreign nationals on drug smuggling charges. The court of appeals reversed the convictions, holding that the evidence was seized in violation of the defendants' fourth amendment rights. The government appealed the reversal. The defendants argued to the Supreme Court that, because the defendants had long since been deported, the appeal was moot. The Supreme Court disagreed:

> That respondents have been deported likewise does not remove the controversy involved. Following a reversal of the Court of Appeals, there would be a possibility that respondents could be extradited and imprisoned for their crimes, or if respondents manage to re-enter this country on their own they would be subject to arrest and imprisonment for these convictions.

*Id.* The Supreme Court thus seems willing to let speculative contingencies prevent the mootness of a government criminal appeal. Because, as in *Villamonte*, the government could seek the extradition of Valdez and Arguelles or because Valdez and Arguelles could face further proceedings in this case upon reentering the country, the appeal is not moot.[1]

## STANDARD OF REVIEW

■■■ Under this court's recent en banc decision in *United States v. Lira–Barraza*, 941 F.2d 745 (9th Cir.1991) (en banc), departures from the applicable Guidelines range are reviewed under a three-step process. *Id.* at 746 (upward departures); *United States v. Floyd*, 945 F.2d 1096, 1098–99 (9th Cir.1991) (downward departures).

First, we review de novo whether the district court was authorized to depart. *Lira–Barraza*, 941 F.2d at 746. Downward departure is not permitted unless the district court has identified a mitigating circumstance of a kind or to a degree the Sentencing Commission did not adequately take into account when formulating the Guidelines. 18 U.S.C. § 3553(b); *see Lira–Barraza*, 941 F.2d at 746; *see also United States v. Ward*, 914 F.2d 1340, 1347 (9th Cir.1990); *United States v. Nuno–Para*, 877 F.2d 1409, 1414 (9th Cir.1989); *Sentencing Guidelines*, Chap. 1, Part A, § 4(b). Furthermore, the identified circumstance must be consistent with the sentencing factors enumerated in 18 U.S.C. § 3553(a). *Lira–Barraza*, 941 F.2d at 746. In making these assessments, "'we must consider the reasons for departure actually articulated by the sentencing court.'" *United States v. Goroza*, 941 F.2d 905, 908 (9th Cir.1991) (quoting *United States v. Montenegro–Rojo*, 908 F.2d 425, 427 (9th Cir.1990)).

In the second step for reviewing a departure, we determine whether the district court clearly erred in its factual findings supporting the existence of the identified circumstance. *Lira–Barraza*, 941 F.2d at 746. Finally, the reasonableness of the degree of downward departure is reviewed, in essence, for an abuse of discretion. *See id.* at 748–51.

## DISCUSSION

■■■ The district court departed downward because it believed that the applicable Guidelines range overestimated the seriousness of defendants' conduct as mere "mules" in the drug trade occurring along the Arizona–Mexico border. To a limited extent, the Guidelines take into account a defendant's role in an offense by providing

---

**1.** In arriving at this conclusion, we focus on the degree of adversariness existing between the parties as they appear before us. As we have stated, we find no significant difference between the degree of adversariness existing in this appeal and that existing in the *Villamonte* case decided by the Supreme Court; we therefore find that the present appeal continues to be justiciable. We note, however, that in *Villamonte*, the Court's reversal of the court of appeals simply led to reinstatement of the defendant's conviction and sentence. *See* 462 U.S. at 581 n. 2, 103 S.Ct. at 2575 n. 2. In the present case, however, any decision other than one affirming the lower court would necessitate resentencing, and possibly preparation of a new presentence report. Whether such proceedings should or could be carried on during a defendant's absence is a question not presently before us.

for a downward *adjustment* in offense level when a defendant is a minor or minimal participant. *See* U.S.S.G. § 3B1.2. As the district court correctly concluded, however, this downward adjustment was not available to Valdez and Arguelles because they were the sole participants in the offenses to which they pleaded guilty. *See United States v. Zweber*, 913 F.2d 705, 708–09 (9th Cir.1990).

While an *adjustment* in defendants' respective offense levels based on the factor articulated by the district court was not possible, we must determine whether a *departure* was available on this ground. The Guidelines allow a sentencing court to depart from the recommended range on the basis of a factor listed in the Guidelines when " 'there exists a[ ] ... mitigating circumstance of a kind ... not adequately taken into consideration by the Sentencing Commission' " or when a "factor [for which the Guidelines have accounted] is present to a degree substantially in excess of that which ordinarily is involved in the offense." *Id.* § 5K2.0 (quoting 18 U.S.C. § 3553(b)). Thus, in assessing whether the district court properly departed, we must determine whether the court properly identified defendants' roles in their respective offenses to be of "a kind ... not adequately taken into consideration by the Sentencing Commission" or to represent a degree of relative blamelessness "substantially in excess of that which ordinarily is involved in the offense."

In *United States v. Bierley*, 922 F.2d 1061 (3d Cir.1990), the Third Circuit adopted the same interpretation of the section 3B1.2 minimal participant adjustment as our court espoused in *Zweber*. Specifically, our sister circuit held that the adjustment could not be based on a defendant's role in conduct occurring beyond the offense of conviction. *Id.* at 1065–66. The court then concluded that, in view of the limited application of the section 3B1.2 minimal participant *adjustment*, the Sentencing Commission had failed to consider ade-

quately the role of the defendant in conduct surrounding the offense of conviction. *Id.* at 1066–70. The court thus permitted a downward *departure* analogous to the section 3B1.2 downward adjustment, but based upon defendant's role in events extending beyond the offense of conviction. *Id.* Specifically, the case involved a defendant who purchased child pornography from a government agent. In permitting a downward departure, the Third Circuit noted the factors taken into account by the district court, including

> the fact that the government was the supplier of the only incriminating material found in Bierley's house; Bierley's lack of any other criminal involvement; the unlikelihood of any criminal conduct in the future; ... and Bierley's steady, long-term employment in a job he would lose if incarcerated.

*Id.* at 1066 n. 2.[2]

■ Applying *Bierley* to the present case, we find that the marginal roles played by Valdez and Arguelles in the drug trade, coupled with the unavailability of the section 3B1.2 downward adjustment, could well represent a permissible basis for a downward departure. This is true notwithstanding our court's decision in *Zweber*. Although the dissent in *Bierley* cites *Zweber* for the proposition that the Sentencing Commission has considered a defendant's offense role in all its possible definitions, *id.* at 1071 (Alito, J., dissenting), we do not read *Zweber* so broadly. *Zweber* did not raise the question whether the Sentencing Commission had adequately considered a defendant's role in conduct surrounding his offense. Instead, *Zweber* considered only whether a district court had properly denied the defendants' request for a section 3B1.2 downward *adjustment* based on defendants' roles in conduct beyond their offenses of conviction. 913 F.2d at 708. The issue of downward *departure* based on defendants' roles was not raised.

---

**2.** The district court in *Bierley* also mentioned "Bierley's attribution of his involvement in the offense to his strong interest in collecting highly unusual objects." 922 F.2d at 1067 n. 2. The

court of appeals discounted this factor in deciding whether a downward departure was available to Bierley. *See id.* at 1070 n. 5.

■ Nor can we otherwise accept the position taken in the *Bierley* dissent. Guidelines section 3B1.4, which indicates that sections 3B1.1–.3 provide the exclusive basis for *adjustments* based on "role in the offense," says nothing about *departures* based upon similar considerations. *See Bierley*, 922 F.2d at 1068 ("We have found no indication in the Guidelines that the Sentencing Commission has considered and rejected *departure* from the Guidelines when there is a close analogy to an adjustment for Role in the Offense.") (emphasis added). Furthermore, no provision of the Guidelines bars a downward departure for marginal culpability, whether the case concerns "mules" in drug trafficking or other relatively blameless defendants. Indeed, as the Guidelines are currently formulated and interpreted, downward departures based on a defendant's role in events extending beyond the offense of conviction must be recognized in order to give effect to the Sentencing Commission's intent.

Application notes two and three to Guidelines section 3B1.2 recognize that a reduced sentence is in order in the extreme case "where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs," as well as in the less extreme case where the defendant "is less culpable than most other participants" but, for example, was involved in a one-time effort to smuggle more than "a small amount of drugs." U.S.S.G. § 3B1.2 comment. (nn. 2 & 3). Yet, under *Zweber*, the availability of reduced sentences in such cases would depend strictly on the offense with which the defendant was charged unless a downward departure for a role in conduct outside the scope of the offense was possible. In view

of the application notes to section 3B1.2, we conclude that the *Bierley* court was correct to recognize the possibility of downward departures based on a defendant's role in conduct extending beyond the offense of conviction, at least where the offense of conviction precludes a downward adjustment under section 3B1.2. *See Bierley*, 922 F.2d at 1069.

The *Bierley* court thus relied on a "mitigating circumstance of a kind ... not adequately taken into consideration by the Sentencing Commission" in permitting downward departures based on a defendant's role in conduct extending beyond the offense of conviction. Downward departures may also be warranted on the ground that, even when the section 3B1.2 downward adjustment is available to a defendant, the defendant's role in criminal activity is so remote that relative blamelessness "is present to a degree substantially in excess of that which ordinarily is involved in the offense." *See United States v. Alba*, 933 F.2d 1117, 1121–22 (2d Cir.1991).

■ In identifying a permissible basis for departure, the district court had to determine whether the instant case presented a condition sufficiently atypical to justify departure—i.e., whether "mules" are generally less culpable participants in a drug conspiracy. To make that determination, the court examined the socioeconomics and the internal politics of the drug trade along the Mexican border and the sentencing patterns in other drug cases arising from trafficking across that border.[3] Based on its view of the conditions along the border, the district court found that drug "mules" were as blameless as minor or minimal participants in a conspiracy to import mari-

3. Although departure on the basis of socioeconomic factors is generally impermissible, *see* U.S.S.G. § 5H1.10, courts can look to socioeconomic conditions in determining whether an otherwise permissible factor presents a sufficiently atypical situation to form a basis for departure. For example, in affirming a downward departure from the Guidelines, one court has relied in part on the substantially higher unemployment rate on the Pine Ridge Native American reservation. *United States v. Big Crow*, 898 F.2d 1326, 1331–32 (8th Cir.1990). The *Big Crow* court specifically found that the

defendant's employment history in such "a difficult environment" was "sufficiently unusual to constitute grounds for a departure." *Id.* at 1332. In looking to socioeconomic factors, however, we do not mean to exclude the possibility of a downward departure for the dissent's hypothetical wealthy Mexican businessperson, so long as her culpability is on a level with defendants'. Contrary to the dissent's suggestion, the departure in this case is grounded on defendants' role in smuggling operations rather than on pure socioeconomic considerations. It is the former factor which permits us to view the latter.

juana, and perhaps even less so. The court also found that, if it imposed a sentence within the applicable Guidelines range, it would be sentencing "mules" to longer terms than full participants in a conspiracy. Thus, the district court concluded that the lesser culpability of "mules" in the drug trade was sufficiently atypical to warrant departure.

We agree with the district court that the role in the drug trade played by "mules" may constitute a mitigating circumstance of a kind or to a degree that the Sentencing Commission did not take into consideration in formulating the Guidelines. As the district court pointed out, "mules" along the Mexican border are uniquely situated in terms of their role in the drug trade, being even less involved in the overall drug business and with less to gain from the success of the drug enterprise than ordinary underlings in conspiracy cases.[4] This is a peculiar condition that the Sentencing Commission did not address in its deliberations. We need not decide, however, whether this departure is more akin to *Bierley* or *Alba* because the government does not seek review of the reasonableness of the departure's extent, and the extent of the departure does not strike us as warranting sua sponte review.[5]

In light of the foregoing, we affirm the district court's downward departure from the recommended Guidelines range based on the fact that defendants participated in the drug trade as mere "mules."

AFFIRMED.

FERNANDEZ, Circuit Judge, dissenting:

I cannot agree with the proposition that a district court can depart radically downward because of its perception of conditions on the Mexican border and of other plea agreements that it has, apparently, accepted in the past.

The majority approves the district court's use of what cannot be anything but a socio-economic status claim that the conditions which exist along the Mexican border induce people to commit crimes, but says that it is not socioeconomic at all because it is simply descriptive of certain players in the drug trade. I cannot agree with that characterization. It is very clear that the socioeconomic condition of these, and other, drug couriers was precisely the point the district court was making. There is nothing to suggest that if the defendant were a wealthy Mexican businessman, the dire conditions that others face in that country would have resulted in a departure. The district court's reflection only has bite because these appellants were presumably a part of the class afflicted by socioeconomic deprivations. In my opinion, that is precisely the kind of information that the district court cannot use to depart. *See* U.S.S.G. § 5H1.10. *See also,* 28 U.S.C. § 994(d). *Cf.* U.S.S.G. § 5K2.12. I recognize that *United States v. Big Crow,* 898 F.2d 1326 (8th Cir.1990), is to the same effect as the majority opinion, but, as the dissent in that case pointed out, that decision is itself incorrect. Of course, in *Big Crow* the court at least keyed on the defendant's good deeds in a bad environment, not on his evil deeds.

Nor does minimizing appellants' culpability by repeatedly calling them "mules" advance the argument. They were, in fact, caught smuggling large quantities of marijuana into this country. Of course, we can label their culpability as "marginal," as the majority does, but simply saying so does not make departure proper. Just how the activity of a person who actually brings dangerous drugs into the country can be called marginal is beyond me. That activity is an exceedingly important link in the drug trade—break it and you have solved a large part of the drug problem. Thus, even if *United States v. Bierley,* 922 F.2d 1061 (3d Cir.1990), were properly decided, a dubious proposition as the dissent in that

---

4. Defendant Valdez would have received at most $2,000 to transport between 50 and 100 kilograms of marijuana. Defendant Arguelles would have received $1,000 to transport 190 pounds.

5. Nor has the government challenged as clearly erroneous the factual findings of the district court.

case points out, it would not apply here.[1] A better analogy would be some poor soul who has just purchased a small quantity of marijuana for personal use. In short, the majority attempts, with great verve and subtlety, to turn lead into gold, but it suffers the fate of the alchemists.

The assertion that plea bargaining had resulted in lower sentences for some people, whom the district court deemed worse, points to another fact that should not have been considered. A purported plea bargain is not binding upon the district court—the court need have none of it. One purpose of the Guidelines is, indeed, to eliminate unwarranted disparity in sentencing. 18 U.S.C. § 3553(a)(6). That hardly means that a district court should countenance an undue lowering of sentences for those who, on balance, do not deserve it[2] and then use that fact as an excuse to lower the sentences of others.[3] In fact, the Sentencing Commission has been quite explicit about the need to make sure that plea agreements do not undermine the Sentencing Guidelines. See the Introductory Commentary to Part B of Chapter 6 of the Guidelines, which cautions against approving agreements that will promote unwarranted sentence disparity. Yet, acceptance of this element of the district court's decision allows it to create its own sentencing scheme by first approving of some plea bargains which allow a sentence below that which would otherwise obtain, and by then using its own approval as a reason to depart downward.

Therefore, what we have here is a concatenation of a ground which improperly keys on the socioeconomic status of the defendant with a similarly improper attempt by a judge to impose his own ideas of disparity. The result is that a couple of drug couriers, who, taken together, were bringing 136 to 186 kilograms of marijuana into this country, were given a period of imprisonment as much as five times lower than that provided for in the Guidelines. All of that is based upon facts that are only to be found in the mind of the sentencing judge as far as the record shows us. Of course, the sentencing judge had his own formula. One of these appellants was given almost twice as much time in prison as the other, although both may have been in the same Guideline range.[4] That gives me little confidence in the approach that the majority endorses. Instead, I fear that the majority might actually deal a serious blow to Congress' approach to the elimination of disparity by allowing district judges to create their own separate sentencing regimes.

Perhaps Congress should resile from its sentencing experiment. Until it does, I think that it, the Commission, and the Guidelines are entitled to more respect than the district court showed them. Thus, I respectfully dissent.

1. *Bierley*, and now the majority, distinguishes our decision in *United States v. Zweber*, 913 F.2d 705, 708–09 (9th Cir.1990), on grounds that it only dealt with an adjustment, not a departure. Oddly enough, the result is that appellants can seek, and obtain, an enormous departure rather than trying to take a niggardly two to four points off their Guideline scores.

2. If the individuals did deserve the reduced sentence for certain reasons, then those cases hardly offer a reason for reducing the sentence of people who do not deserve it for the same reasons.

3. The district court expressed a concern that those who provide helpful information and otherwise cooperate with the government are given consideration, while those who do not, or cannot, fail to get the same consideration. Although the concern about the seeming unfairness wrought by that is understandable, it is built into our legal system and the Guidelines. When one commits crimes one puts himself in the toils of the criminal law, its aims and its policies. One of those aims is the unraveling of criminal organizations and the capturing of other criminals, and one policy is the offering of incentives which encourage criminals to help pursuit of that aim. *See, e.g.,* U.S.S.G. § 5K1.1 and § 3E1.1. Thus, while I understand the district court's concern, I do not think it justifies the action that court took in this case.

4. Actually, the court's calculations showed that one of them, Valdez, was in a higher Guideline range, but he was given the lower of the sentences, even though both appellants were in the same criminal history category.