UNITED STATES of America, Plaintiff,

v.

Gilberto REDONDO–LEMOS, Defendant.

UNITED STATES of America, Plaintiff,

v.

Sergio ALCARAZ–PERALTA, Defendant.

UNITED STATES of America, Plaintiff,

v.

Angel NOLASCO–COTA, Defendant.

Nos. CR 89–208 TUC ACM, CR 91–016 TUC ACM and CR 90–522 TUC ACM.

United States District Court,
D. Arizona,
Tucson Division.

March 29, 1993.

Daniel G. Knauss, U.S. Atty's Office, Tucson, AZ, for plaintiff.

Fernando X. Gaxiola, Fernando X. Gaxiola & Associates, Tucson, AZ, for defendant Redondo–Lemos.

Thomas G. Hippert, Dardis & Hippert, P.C., Tucson, AZ, for defendant Alcaraz–Peralta.

Jacqueline Marshall, Ralls, Bruner, Valenzuela & Marshall, P.C., Tucson, AZ, for defendant Nolasco–Cota.

## ORDER

MARQUEZ, Senior District Judge.

### Introduction

This memorandum decision addresses *United States v. Redondo–Lemos, United States v. Nolasco–Cota,* and *United States v. Alcaraz–Peralta* collectively upon remand from the Court of Appeals for the Ninth Circuit.

The United States appealed from this Court's order which determined that the United States Attorney's Office for the District of Arizona in Tucson acted arbitrarily and discriminated on the basis of gender in plea bargaining with the Defendant Gilberto Redondo–Lemos. The Court sentenced Redondo–Lemos to 18 months of incarceration, reasoning that a downward departure was warranted because to impose a harsher sentence on Redondo–Lemos would deny him equal protection and due process. The Court of Appeals held that (1) although charging and plea bargaining decisions were subject to the constitutional requirement that they not be made in an arbitrary or capricious manner, the court could not review decisions for compliance with that requirement, and (2) the court had limited authority to remedy unconstitutional discrimination on the basis of gender in plea bargaining decision. *United States v. Redondo–Lemos,* 955 F.2d 1296 (9th Cir.1992). The Court of Appeals reversed this Court's finding that the United States Attorney's Office acted in an arbitrary manner and remanded the case on the issue of gender discrimination. *Id.*

The Court of Appeals further vacated this Court's sentencings in the cases of *United States v. Nolasco–Cota* [1] and *United States v. Alcaraz–Peralta,* [2] and remanded these cases

for further proceedings consistent with *Redondo–Lemos.*

### Facts

#### I. *Gilberto Redondo–Lemos*

Defendant Gilberto Redondo–Lemos was stopped and arrested by United States Customs on May 23, 1989, while driving a van which carried 695 pounds of marijuana. He admitted that he was to be paid for driving the van to Mexico, pick up a load of marijuana and return the marijuana to Tucson, Arizona. He stated he agreed to do this because he had just been laid off from work, unable to find employment, and had to take care of his wife and child.

Because he readily admitted his guilt and was only a minor participant, he immediately sought a plea agreement. The Government refused to allow Redondo–Lemos to plead to a lesser included amount, though he alleges women in similar circumstances were being offered favorable plea agreements.

On September 14, 1989, Redondo–Lemos pled to the indictment and was sentenced to 18 months incarceration and 48 months supervised release on July 15, 1990.

Redondo–Lemos completed his sentence as a model prisoner and his deportability was waived by an Immigration and Naturalization Service Judge. He is now employed and supporting his family in Tucson, Arizona, and continues to be a model citizen while on supervised release.

On May 11, 1992, the Court of Appeals for the Ninth Circuit reversed this Court's downward departure from the mandatory guidelines and determination that the United States Attorney's Office acted arbitrarily. The Court of Appeals further remanded this case for further proceedings on the issue of discrimination on the basis of gender in plea bargaining with Redondo–Lemos.

#### II. *Sergio Alcaraz–Peralta*

Defendant Sergio Alcaraz–Peralta was stopped on December 18, 1990, near Sasabe, Arizona. A search of his car revealed approximately 444 pounds of marijuana. Alcaraz–Peralta admitted his involvement from

---

1. 963 F.2d 381, No. 91–10258, May 18, 1992.

2. 967 F.2d 591, No. 91–10510, July 2, 1992.

the beginning, advising law enforcement officials and the Court that he had been offered a sum of money for transporting the car from Sasabe, Sonora, to Tucson, Arizona. He further admitted that he was not sure what the car contained nor how much, but that he knew it was probably illegal. He stated he agreed to the offer to enable him to finance continued medical care for his children, some of whom suffer from a hereditary form of epilepsy.

Because Alcaraz–Peralta readily accepted responsibility for his role in the offense, a plea agreement was sought. A tentative plea was negotiated with acceptance of the agreement by the United States Attorney conditioned upon successful completion of a polygraph exam. Alcaraz–Peralta willingly submitted to this exam, however he allegedly suffered an epileptic episode and was unable to go through with the exam. He was unable to complete a second polygraph for similar reasons, after which the United States Attorney rescinded its offer. The matter then proceeded to trial and Alcaraz–Peralta was found guilty.

Due to the unique circumstances of the case, the Court departed downward from the mandatory guideline sentence by imposing a term of 24 months on September 13, 1991, referring to its rationale in *Redondo–Lemos*.

On May 18, 1992, the Court of Appeals for the Ninth Circuit reversed this Court's judgment and remanded this case for further proceedings consistent with *Redondo–Lemos*.

### III. *Angel Nolasco–Cota*

Defendant Angel Nolasco–Cota was indicted on one count of possession with intent to distribute over 100 kilograms of marijuana on December 27, 1990, following his arrest at a United States Border Patrol checkpoint on Interstate 19 near Nogales, Arizona, during which marijuana was found in his vehicle.

At a pretrial hearing, the Court expressed its observation that the United States Attorney's Office in Tucson was unconstitutionally applying the minimum mandatory drug laws. The Court continued the hearing to see if the prosecutor would agree to a plea agreement under the minimum mandatory sentence of five years.

At a subsequent hearing, the prosecutor explained that due to office policy, he could not offer such a plea agreement. The Court referred to its rationale in *Redondo–Lemos* and expressed that Nolasco–Cota should be offered the opportunity to plead guilty to a lesser involved offense and avoid the five-year mandatory minimum sentence.

On March 12, 1991, over the objection of the United States Attorney's Office, Nolasco–Cota pled guilty to possession with intent to distribute between 50 to 100 kilograms of marijuana and was sentenced to 169 days in prison and 36 months of supervised release on May 6, 1991.

On July 2, 1992, the Court of Appeals for the Ninth Circuit reversed this Court's judgment and remanded this case for further proceedings consistent with *Redondo–Lemos*.

### Discussion

### I. Constitutional Requirement That Plea Bargaining Decisions Not Be Made In Arbitrary Or Capricious Manner

The Court of Appeals emphasized that "[t]he task of safeguarding the rights of criminal defendants ultimately rests with the experienced men and women who preside in our district courts." *United States v. Redondo–Lemos*, 955 F.2d 1296, 1298 (9th Cir. 1992), *quoting United States v. Balough*, 820 F.2d 1485, 1491 (9th Cir.1987). The Court of Appeals further emphasized:

> Where a district judge detects what he suspects may be an error seriously affecting the rights of a criminal defendant, he must address the problem. This duty exists at all times, but never more so than when the problem is such that it is unlikely to be detected by an individual defendant.... A district judge who perceives a pattern of invidious enforcement has ample authority under the court's supervisory powers to raise the matter sua sponte.

*Redondo–Lemos*, 955 F.2d at 1298 (citation omitted).

The Court, sua sponte, requested random statistics on sentences received for drug offenses in this district which occurred after the cases at issue. A list of offenders sentenced for drug offenses in the United States

District Court for the District of Arizona, Tucson Division, on or after February 1, 1992, was provided on December 4, 1992 by the local United States Probation Office. An informal analysis reveals that approximately 11 percent of males sentenced for drug related convictions received straight probation compared with 35 percent of the females sentenced during this same time period. The average term of incarceration for male drug offenders for this same time period was 36 months, compared to an average 32–month period of incarceration for female drug offenders.

The Court does not purport to proffer these statistics as a scientifically accurate study. It does, however, support the Court's day to day observations that the male "mule"[3] is the target of the United States Attorney's Office's inconsistent prosecutorial treatment. *See United States v. Redondo–Lemos,* 754 F.Supp. 1401, 1409 (1990).

■ While this Court's finding of arbitrarily selective prosecution is sufficient to establish a prima facie showing of due process violation, its hands are tied to remedy a violation of a defendant's constitutional right. The Court is precluded from inquiring whether the prosecutor's discretion in plea bargaining is exercised in an arbitrary or capricious fashion. The Ninth Circuit emphasized that such an inquiry is inconsistent with the division of responsibilities assigned to each branch of government and that "such judicial entanglement" would enable a court to evaluate whether or not a prosecutor's charging decision was made in an arbitrary fashion, destroying the very system of justice it was intended to protect. Absent proof of discrimination based on suspect characteris-

tics, i.e., race, religion, or gender, a court may not review a prosecutor's decision to charge a particular defendant.[4] The Court of Appeals reached the conclusion that the "only available course is to deny the defendant a judicial remedy for what may be a violation of a constitutional right—not to have charging or plea bargaining decisions made in an arbitrary or capricious manner." *Redondo–Lemos,* 955 F.2d at 1300.

> [A]lthough a defendant has a due process right to be free of arbitrary or capricious charging decision, there is no judicial remedy to correct such violations.

*United States v. Diaz,* 961 F.2d 1417, 1420 (9th Cir.1992) (*citing Redondo–Lemos,* 955 F.2d at 1300–1301).

A defendant who is disadvantaged by this compromise will find no solace in the trust afforded the United States Attorney and the Attorney General to "give due consideration to ... observations and take whatever steps may be necessary to eliminate any constitutional infirmities in the charging process for this case and others." *Redondo–Lemos,* 955 F.2d at 1300.

## II. Gender Discrimination

Addressing the issue of discrimination, specifically this Court's observation that the United States Attorney's Office discriminated on the basis of gender in exercising its prosecutorial discretion, the Ninth Circuit stated:

> A claim of sex discrimination (or discrimination based on race, religion, or a similar characteristic) raises not only due process but also equal protection concerns. Troublesome as may be suspicions that prosecutorial discretion is being exercised in an

---

**3.** The "mule" is generally a poor person who is offered what appears to him as a large sum of money to either drive a vehicle containing drugs or carry drugs on his back across the border. In most cases, the mule is unaware of the amount or the kind of drug he is transporting. This Court has determined that, based on the socioeconomic and the internal politics of the drug trade along the Mexican border, drug mules were as blameless as minor or minimal participants in a conspiracy to import drugs and that due to their unique situation, were even less involved in the overall drug business, with less to gain from the success of the drug enterprise, than ordinary underlings in conspiracy cases.

*United States v. Valdez–Gonzalez,* 957 F.2d 643, 649–650 (9th Cir.1992). Mules are in no position to cooperate with the government in a more extensive investigation because they know nothing. *United States v. Redondo–Lemos,* 754 F.Supp. 1401, 1402 (1990). This is a peculiar condition that the Sentencing Commission did not address in its deliberations and one which warrants a downward departure from the recommended guidelines range. *Id.,* 957 F.2d at 650.

**4.** See *United States v. Nance,* 962 F.2d 860, 864–65 (9th Cir.1992); *United States v. Redondo–Lemos,* 955 F.2d 1296, 1300–01 (9th Cir.1992).

arbitrary fashion, such concerns are heightened to an unacceptable level where there is an indication that the power to prosecute is being exercised to favor (or disfavor) particular classes of defendants on the basis of race, religion, gender, or similar suspect characteristics. The use of governmental authority to divide the population along suspect lines is a much more serious matter than the capricious exercise of power standing alone. (footnote omitted)

*Redondo–Lemos*, 955 F.2d at 1300–1301.

A disparity in the treatment of classes of defendants can be determined at a threshold level on the basis of statistical evidence, keeping the court's entanglement with and supervision of the prosecutorial function to a minimum. If a disparity is found, the district court has authority to inquire into charging and plea bargaining; however, the court's authority to remedy unconstitutional conduct is limited.

[C]ourts do indeed have the authority to inquire into charging and plea bargaining decisions to determine whether the prosecutor is abusing her awesome power to favor or disfavor groups defined by their gender, race, religion or similar characteristics.... It is not enough for the court to be convinced that the prosecutor's enforcement decisions have a discriminatory effect; it must also find that the prosecutor was motivated by a discriminatory purpose in the very case before it. (footnotes omitted).

*Id.*

■ Pursuant to its remand on the issue of gender discrimination, the Ninth Circuit offered guidance suggesting a three-part approach on how the District Court should handle proceedings on the issue of wrongful discrimination. *Id.* at 1302. First, the defendant must make a sufficient showing of purposeful discrimination. Secondly, once a showing of purposeful discrimination has

been made to the district court's satisfaction, the Office of the United States Attorney must be given an opportunity to present evidence rebutting the prima facie case. If the district court is satisfied by the prosecutor's showing, the matter is concluded. If the district court finds by a preponderance of the evidence that the prosecutor's charging or plea bargaining practice has a discriminatory impact, it must then determine whether the prosecutor was motivated by a discriminatory purpose in charging the defendant who is before the court.

■ First, where a defendant raises a claim of selective prosecution, he must present enough evidence to demonstrate a reasonable inference of invidious discrimination. *Id.;* see also *Batson v. Kentucky,* 476 U.S. 79, 87–88, 106 S.Ct. 1712, 1718–1719, 90 L.Ed.2d 69 (1986). The Court of Appeals affirmed that this Court's suspicion of unconstitutional conduct on the basis of its own day to day observations establishes a sufficient prima facie showing, which satisfies the first requirement. *Redondo–Lemos,* 955 F.2d at 1302. The Court also finds that Defendants Redondo–Lemos, Nolasco–Cota and Alcaraz–Peralta have made a showing to demonstrate a reasonable inference of invidious discrimination prohibited by the Fifth Amendment of the United States Constitution.[5]

Once the district court determines that there has been a sufficient showing of purposeful discrimination, the burden then shifts and the Office of the United States Attorney must be given an opportunity to present evidence rebutting the prima facie case.[6]

The Ninth Circuit anticipated that statistics would be presented to enable opposing counsel to understand and analyze them and for the district court to make a meaningful judgment.[7] No statistics were provided. An evidentiary hearing was held on October 19, 1992 and October 20, 1992, during which the Office of the United States Attorney presented the testimony of Dr. Ronald Oaxaca who,

5. See *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

6. *Redondo–Lemos,* 955 F.2d at 1302; *Batson v. Kentucky,* 476 U.S. at 94, 106 S.Ct. at 1721; *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972).

7. *Redondo–Lemos,* 955 F.2d at 1302.

in summary, testified that to achieve a statistically reliable result in respect to the issue of gender bias, a lengthy and expensive study would need to be conducted.[8]

During the evidentiary hearing, the United States Attorney's Office called prosecutors from the Tucson office, who essentially testified that prosecutorial decisions made by the local office, including their own, were not motivated by a discriminatory purpose based on the gender of the Defendants.

While the Defendants incorrectly argue that the motivation behind this bias is irrelevant, they correctly conclude that the United States Attorney's Office has failed to rebut the prima facie showings of discriminatory impact and intent in the cases of these three Defendants.

The burden to rebut a prima facie showing of discriminatory impact cannot be met "on mere general assertions that its officials did not discriminate or that they properly performed their official duties." *Batson v. Kentucky,* 476 U.S. at 94, 106 S.Ct. at 1721; see *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1972); *Jones v. Georgia,* 389 U.S. 24, 25, 88 S.Ct. 4, 5 (1967). The United States Attorney's Office must demonstrate that permissible sex neutral criteria and procedures have produced the "monochromatic result." *Batson v. Kentucky,* 476 U.S. at 94, 106 S.Ct. at 1721; *Alexander v. Louisiana,* 405 U.S. at 632, 92 S.Ct. at 1226; see also *Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976).

Based on the preponderance of the evidence, the Court finds that the charging and plea bargaining practice of the Office of the United States Attorney has a discriminatory impact and, therefore, must determine whether the Assistant United States Attorneys were motivated by a discriminatory purpose in charging the Defendants before the court.

The United States Attorney's office relies on *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), asserting that a defendant who alleges an equal protection violation has the burden of showing by "exceptionally clear proof" that the Assistant United States Attorneys assigned to their cases acted with a discriminatory purpose and that the prosecutor acted in part because of, and not merely in spite of, an adverse effect upon male defendants.

While a showing of discriminatory intent is required in a disparate impact challenge, it is not necessary to show that discrimination was the sole, or even the primary, motivation. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1971); *Navajo Nation v. State of New Mexico,* 975 F.2d 741 (10th Cir.1992).

The Supreme Court has specifically addressed this issue, holding that:

> "Discriminatory purpose" ... implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects on an identifiable group. (citation omitted).

*Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). Therefore, while "more than intent as volition or intent as awareness of consequences" is implied by discriminatory purpose, *Id.,* the "exceptionally clear proof" standard which the Government asserts is not one which is unequivocal. "Discriminatory intent is simply not amenable to calibration. It either is a factor that has influenced the legislative choice or it is not." *Navajo Nation v. State of New Mexico,* 975 F.2d at 744, (quoting *Feeney,* 442 U.S. at 277, 99 S.Ct. at 2295.)

If discrimination is a factor, the action violates the Equal Protection Clause guarantee against invidious discrimination. *Id.*

When the adverse consequences upon an identifiable group are inevitable, such as gender-based consequences, a strong inference

**8.** Dr. Oaxaca testified that such a study would require a sample of 800 to 1000 cases, would take two years with several investigators working part-time (as is common in the field since most such experts work on a number of studies concurrently), and would cost approximately $109,000.00 plus an additional 50 percent for overhead. See United States of America's Memorandum of Points and Authorities, November 13, 1992, page 11.

that the adverse effects were desired can reasonably be drawn. While such an inference is not proof, it is a "working tool." *Feeney*, 442 U.S. at 279, 99 S.Ct. at 2296, n. 25.

The impact on male defendants, specifically Redondo–Lemos, Nolasco–Cota and Alcaraz–Peralta, is an unavoidable consequence of the disparate practices of the local United States Attorney's Office in charging and plea bargaining with female and male defendants similarly situated.

The Court cautions that this finding should not be misconstrued as a mandate for harsher prosecutorial treatment of women, but rather a finding that male defendants should not be subjected to disparate treatment in violation of their right to equal protection.

Some of the factors that may be relevant to a finding of discrimination, particularly where the evidence is circumstantial rather than direct, were set forth in *Arlington Heights* and reiterated in *Navajo Nation* as follows: (1) the historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes; (2) the specific sequence of events leading up to the challenged decision; (3) departures from the normal procedural sequence; and (4) the legislative or administrative history, especially where there are contemporary statements by members of the decisionmaking body. *Arlington Heights*, 429 U.S. at 267–68, 97 S.Ct. at 564–65; *Navajo Nation*, 975 F.2d at 744.

The history of the local United States Attorney's Office's charging and plea bargaining decisions reveals a disparate impact on male defendants. Based on the observations of the Court, female defendants are sequentially treated more favorable than males. The statistical reports provided by the local probation office support these two factors.

As to the third factor listed as relevant to a finding of discrimination, the Court may deduce from the testimony of one of the Assistant United States Attorneys that there is a departure from the normal procedural sequences in charging and plea bargaining where a case involves a Mexican male.[9]

The Assistant United States Attorney testified that in a specific case where a husband and wife were arrested, the charges against the woman were dismissed while the man accepted a plea agreement and was sentenced accordingly, even though the evidence was probably stronger against the woman.[10] While the Assistant United States Attorney stated that this decision was not based on favoritism for female defendants, he did agree that where a male and female defendant, who have some kind of a relationship where children are involved, are equally charged in a narcotics case, it is more common for men to agree to plead on behalf of their "paramour" than it is for women.[11] When asked if such decisions were made by the United States Attorney's Office, whether pleas of men were requested over women, or whether such agreements were initiated by the defendants, the Assistant United States Attorney responded that in the present case, the plea offer was brought to him; in some cases he "expected them to do it."[12] "It's not anything unusual when you have got husbands and wives and they have got kids and nobody to take care of them.... it's usually the Mexican males that will stand and take it."[13]

When asked by the Court if this was based upon culture, the Assistant United States Attorney agreed that the general feeling is "that it is the man's responsibility if they have been in a crime together to take the rap."[14]

**9.** While this observation raises the issue of discrimination on the basis of race, a sufficient showing that male defendants are discriminated against on the basis of race has not been presented. Rather, the Court finds that this is yet another consequence of the unique circumstances along the border.

**10.** See Transcript of October 19, 1992, Evidentiary Hearing, Testimony of Assistant United States Attorney Randy Stevens, pages 81–82.

**11.** Id., page 81.

**12.** Id., page 82.

**13.** Id.

**14.** Id.

Finally, a special report to Congress from the United States Sentencing Commission disclosed that a lack of uniform application of the guidelines creates unwarranted disparity in sentencing, and compromises the potential for the guidelines sentencing system to reduce disparity.[15] The Commission's study uncovered sentencing disparities based on factors such as race, gender, circuit, and prosecutorial practices. Included in the Commission's report were the findings that female defendants were less likely to be sentenced at or above the mandatory minimum level than male defendants and that prison terms required by mandatory minimum sentences often outweigh the severity of the offenses and the culpability of the offenders. The Commission summarized that the honesty and truth in sentencing intended by the guidelines system is compromised since charging and plea negotiations processes are neither open to public review nor generally reviewable by the Courts.

Based on the failure of the United States Attorney's Office to rebut the prima facie showing of discriminatory impact and consideration of the factors relevant to a finding of discriminatory intent, the Court finds by a preponderance of the evidence that there has been intentional discrimination on the basis of gender, and thereby the Court gives Redondo–Lemos the benefit of the plea bargain he would have received but for the discrimination. *Redondo–Lemos*, 955 F.2d at 1302.

The Court heeds the caution issued by the Ninth Circuit in regards to the restraint on the part of the district court in conducting its inquiry and issuing systematic relief to minimize friction and maintain the separation of powers, *Id.* at 1303, and hereby issues the following relief to the Defendants Redondo–Lemos, Nolasco–Cota and Alcaraz–Peralta as appropriate to their individual cases based on the Court's findings.

Based on the foregoing,

**IT IS ORDERED** that Defendant Redondo–Lemos receive the benefit of the plea bargain as originally accepted by the Court and that his original sentence of 18–months

incarceration and 48 months of supervised release is reaffirmed;

**IT IS FURTHER ORDERED** that Defendant Nolasco–Cota receive the benefit of the plea bargain as originally accepted by the Court and that his original sentence of 169 days of incarceration and 36 months of supervised release is reaffirmed;

**IT IS FURTHER ORDERED** that the Court's original order sentencing Defendant Alcaraz–Peralta to 24 months was an appropriate departure from the mandatory guidelines and is, therefore, reaffirmed.

**15.** United States Sentencing Commission, Special Report to the Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System, August 1991.